## IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF LOUISIANA

JANE DOE

     Plaintiff,

  v.

The CITY OF BATON ROUGE; BATON ROUGE POLICE
DEPARTMENT; JAMES WEBER; CHARLES DOTSON;
STEPHEN MURPHY; SHANARD CAREY; JOHN WINDHAM;
MURPHY PAUL, Jr.; CAITLIN CHUGG; JAMES KNIPE;
TODD TYSON; BRENDEN CRAIG; EBONY CAVALIER;
LISA FREEMAN; KIMBRA BROOKS; DEELEE MORRIS;
SHONA STOKES; CAPITAL AREA FAMILY VIOLENCE
INTERVENTION CENTER, INC.; EBONY CAVALIER;
ROBERT HUNT; EAST BATON ROUGE PARISH; EBR DISTRICT
ATTORNEY OFFICE; HILLAR MOORE; MELANIE FIELDS;
LISA WOODRUFF-WHITE; STATE OF LOUISIANA; LA DEP. OF
JUSTICE; JEFFREY LANDRY; PATRICK MAGEE; RONALD BEAVER;
KYLE POULICEK; BRAD CRANMER; CHRISTOPHER NAKAMOTO;
DAWN SHARP; WILLIAM MORVANT; SHALIMAR SMALL; ASHTON
HOLLOWAY; DANIEL NELSON; BLAKE BOOTH; BLAKE
WILLIAMSON; KATIE CRAFT; Dr. LAURA HETZLER,

NO: _____

**JURY DEMAND**

    Defendants.

RECEIVED

AUG 0 6 2020

U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DEPUTY CLERK

## COMPLAINT

Plaintiff Jane Doe brings her complaint against the above-named defendants:

## JURISDICTION AND VENUE

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and the Constitution of the United States. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a). There is jurisdiction over Plaintiff's state law claims pursuant to the Court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

2. Venue is proper in this district under 28 U.S.C. § 1391(b). The defendants reside in this judicial district, and the events giving rise to the Complaint occurred in this district as well.

## PROCEEDING PSEUDONYMOUSLY

3. Many federal courts allowed parties to proceed pseudonymously in the matters where "plaintiffs seeking anonymity were suing to challenge governmental activity" and "prosecution of the suit compelled plaintiffs to disclose information 'of the utmost intimacy'." Both factors are present in the instant legal action. See *Doe v. Stegall*, 653 F. 2d 180 - Court of Appeals, 5th Circuit, 1981. Plaintiff requests the Court's permission to proceed pseudonymously. Should a separate motion be required, Plaintiff requests that the third paragraph of this complaint will be construed as a motion for leave to proceed pseudonymously.

## PARTIES

4. Plaintiff Jane Doe is a natural person who resides in Oregon.

5. Defendant James Weber is/was a Baton Rouge Police Department ("BRPD") detective in violent crimes unit, major assaults division, assigned to investigate the crimes of multiple second-degree batteries, committed against Jane Doe by Poulicek, an employee of the Louisiana Department of Justice. Weber is responsible for the entire crime cover-up, evidence suppression and fabrication, continuous cybercrimes, committed against Plaintiff, intimidation of Plaintiff, gross various violations of Jane Doe's privacy, unconstitutional, unlawful totalitarian-like censorship of Plaintiff, and infliction of the physical injuries with a dangerous weapon onto Plaintiff. All that have been done with full authorization and assistance of Weber's supervisors and other co-conspirators, made defendants in this complaint, as well as unknown, unsued co-conspirators. Defendant Charles Dotson is/was a sergeant of the same division and Weber's direct supervisor and defendant Stephen Murphy is/was a lieutenant in charge of violent crimes unit, major assaults division and a supervisor of both Weber and Dotson. Defendant Robert Hunt is/was a detective in a digital forensic lab of BRPD who also participated and assisted in the crime cover-up.

6. Defendant Shanard Carey is/was a BRPD captain and Murphy's supervisor. Defendant John Windham is/was a captain in charge of criminal investigations in BRPD. Defendant Murphy Paul, Jr. is/was a chief of BRPD.

7. Defendant the City of Baton Rouge is a Louisiana consolidated city-parish with powers and responsibilities of a municipal corporation as well as an administrative division of the state which

operates Defendant Baton Rouge Police Department ("BRPD") and was/is the employer for all BRPD defendants and other city governmental officials.

8. Defendant Caitlin Chugg was a private attorney, hired by Plaintiff to represent her as a crime victim and assist in "securing prosecution" of Jane Doe's batterer but was in conspiracy with BRPD and other law enforcement agencies, was intentionally duping Plaintiff, lying to her, providing inaccurate, damaging "legal advice," stalling, misinforming Plaintiff, and otherwise actively working against its "client." James Knipe is/was also a private attorney and Chugg's supervisor, similarly working in conspiracy with BRPD to assist it with the crime cover-up and duping of Jane Doe.

9. Defendants Brenden Craig and Todd Tyson are/were private attorneys, representing Jane Doe's batterer in the protective order staged hearing prior to which they eavesdropped on the Plaintiff's "confidential attorney-client" conversation with defendant Ebony Cavalier, a then staff attorney of defendant The Capital Area Family Violence Intervention center, Inc., known as IRIS Domestic Violence Center ("IRIS") that was in absolute conspiracy with other defendants and assisted in criminal eavesdropping and other underhanded, unlawful dealings. All other employees, contractors, and volunteers of IRIS, who were present in the 19th JD courthouse on August 8, 2018 and August 22, 2018 are made unsued co-conspirators.

10. Defendants Lisa Freeman, Kimbra Brooks, and Deelee Morris were "legal advisers" to BRPD who wholly supported criminal dealings of BRPD and assisted in the crime cover-up, central to this complaint. Unsued co-conspirator Chanita Vasquez was Freeman's, Brooks', and likely also Morris's assistant in all dirty dealings, related to the crime cover-up.

11. Defendants Hillar Moore and Melanie Fields are the district attorney and assistant district attorney for the 19th Judicial District (further, "19 JD" or "19 JDC") of the State of Louisiana who, after being contacted multiple times with information and evidence regarding the violent felony crime and the crime cover-up, carried out by BRPD, joined other defendants-co-conspirators in the official crime cover-up. After realizing that, Plaintiff stated to Fields on December 4, 2018 in an email communication that she will "publish all the details of the crime cover-up" and "expose the criminals that run BRPD and LADOJ." As a result, the continuous cybercrimes against Plaintiff ensued and have been carried out to this day where everything she was publishing was being removed, deactivated, or altered and then made unsearchable and undiscoverable by the general public and a hate crime in the form of an aggravated battery by a caustic injection in the Plaintiff's eyelids has been committed under the guise of providing medical services, among other things, detailed in this complaint.

12. Defendant East Baton Rouge Parish is a consolidated governmental entity with powers and responsibilities of a municipal corporation as well as an administrative division within a State of Louisiana and was/is the employer of BRPD defendants, DA defendants, and other defendants and unnamed co-conspirators. East Baton Rouge District Attorney Office is also made defendant in this complaint.

13. Defendant Jeffrey Landry is a Louisiana attorney general who was contacted repeatedly with information and evidence that its employee committed a violent felony crime but at all times ignored Plaintiff and authorized and fully supported the official crime cover-up and further physical injuries to Plaintiff in order to intimidate her into keeping quiet about what has been done by Louisiana law enforcement in charge of whose Landry is.

14. Defendant Patrick Magee is/was in charge of criminal investigations in the Louisiana Department of Justice ("LADOJ"). Defendant Kyle Poulicek is the Plaintiff's batterer, employed/was employed by LADOJ as a Medicaid Fraud Control Unit investigator where defendant Ronald Beaver, is/was a chief investigator and a direct Poulicek's supervisor who was contacted regarding its employee but similarly to all LADOJ defendants, ignored Plaintiff.

15. Defendant Lisa Woodruff-White is/was a judge of The Family Court of the 19th JD who, in conspiracy with all other defendants as well as unknown/unnamed co-conspirators conducted a staged hearing that grossly violated the law and Plaintiff's civil rights and then attempted to get Jane Doe arrested for non-payment of court fees and Poulicek's legal expenses and has been referring to Plaintiff who is the victim of the crime and applied for the protective order as "accused" which can be seen throughout the record of that perverted, outrageously corrupt and partial court dealing it presided over. Notwithstanding the fact of a total commitment of the appellate court to assist in the official crime cover-up and cover up what Woodruff-White has done, it still found Woodruff-White to have "abused (its) discretion."

16. A supervisor of the 19th JDC's "domestic violence" department is a highly unethical, corrupt, and ruthless individual that is made an unsued co-conspirator in this complaint under the fictitious name Con Poe 1 as Plaintiff does not know its full legal name. Woodruff-White's court reporter whose name is being withheld from Plaintiff although she specifically inquired by the way of a subpoena, is another unsued co-conspirator Con Poe 2.  Con Poe 2 has been making all minute entries in the Plaintiff's "protective order" case "anonymously" although all other reporters seem to write their full names or at a first name initial and a last name. "Ronnie" Bullion, the 19th JDC administrator who is listed as a person to be contacted regarding all transcript production requests was subpoenaed to provide an audio-recording of the protective order hearing that took place on

August 22, 2018 and that is analyzed in detail in this complaint, responded with a myriad of inapplicable, invalid general objections and then said it doesn't have it but Welborn does. "Doug" Welborn, a clerk of court for the 19th JDC was subpoenaed for the same – a complete audio-recording, accompanied by an affidavit that no sections or parts of the hearing and the recording were removed or censored or to provide the name of the court reporter in possession of the recording – to which it responded it doesn't have it but Bullion does. No court reporter's name was provided. Bullion and Welborn are unsued co-conspirators.

17. Defendant State of Louisiana is a state in the USA that was/is an employer of all defendants Louisiana Department of Justice and all LADOJ defendants individually as well as other defendants and named and unnamed co-conspirators.

18. Defendant Brad Cranmer is/was a private attorney that agreed to represent Jane Doe as the crime victim but after learning from Chugg and others that everything what happened was an official crime cover-up, joined that cover-up and represented Plaintiff's opponents in the matter, directly connected to the matter it has agreed to represent Jane Doe in and related to what Plaintiff told it during what was supposed to be a confidential attorney-client conversation.

19. Defendant Christopher Nakamoto, an "anchor WBRZ news" and a "chief investigator" is an outrageously corrupt, deceitful co-conspirator that serves corruption under the guise of "an anti-corruption activist" and assists public officials and other politically connected in dirty dealings by stealing evidence under the guise of a "journalistic investigation" and otherwise duping and defrauding the naïve by its phony, fraudulent persona it created and presents to the public.

20. Defendant Dawn Sharp is an otolaryngologist of Our Lady of the Lake physicians group, a Board Member of Health Leaders Network for FMOLHS, and "an active member of the

OLOLRMC Ethics Committee and Medical Executive Committee." While examining Plaintiff shortly after cartilaginous ear fractures have been inflicted on her by Poulicek, Sharp immediately recognized the injuries and stated that it was "broken, damaged cartilage." When Plaintiff realized that Sharp's original diagnosis of the traumatic injuries was either removed from her chart or fraudulently moved to a different category and ambiguously presented as some kind of "congenital deformity," Jane Doe confronted Sharp and asked what happened to her record. In response, Sharp repeated three times that it "cannot get involved in any legal issue" (and that's why the diagnosis was changed at a later time). Sharp created highly confusing, fraudulent "medical records" in which there was nothing about the traumas but several attacks on Plaintiff's credibility. When Plaintiff repeatedly requested her records, Sharp would not release them until was advised of the legal action and its liability for various fees as outlined in La. R.S. 40:1299.96.

When Weber spoke with Sharp, it, according to Weber's report, categorically denied seeing any injuries and traumas on the Plaintiff's ears.

21. Unused co-conspirator The Louisiana State Board of Medical Examiners is an inept, highly political, wholly controlled by corrupt public officials establishment that after being provided with the information regarding Sharp's fraud, records' falsification, and lying about Plaintiff's diagnosis stated that all that "does not affect (Sharp's) license" (to practice medicine). Knowing how corrupt that establishment is, Plaintiff did not even bother filing a complaint against Small for viciously attacking her and injecting with some caustic substance that dissolved and deformed Jane Doe's eyelids. Especially because it was done in line with the official crime cover-up, the laughable LSBME would just dismiss it as it always does.

22. Defendant Shalimar Small is an ophthalmologist that Plaintiff had a tragedy to encounter that, as a part of the conspiracy, intimidation, and hatred towards Jane Doe after her December 4, 2018

statement to Fields that she "will publish all the details about the crime cover-up" and expose "criminals that run BRPD and LADOJ," injected Plaintiff's eye with some corrosive substance under the guise of "providing medical services." As a result, Jane Doe's eyelid partially melted away, got permanently deformed, scar tissues and wounds appeared on the eyelid in response to the acute ocular battery. Filthy Small infected Plaintiff with something that further damaged the skin of the eyelids, the cheek, and other parts of the face where to it migrated. Prior to the attack by Small, Plaintiff never had any infections and had never taken any antibiotics even when was a child.

23. Defendant Ashton Holloway who supervises Small threatened Jane Doe that she will be thrown out by Baton Rouge Police Department if she would not leave when she insisted that whatever was injected at her should be removed.

24. Defendant Daniel Nelson whose help Plaintiff sought after she has been attacked and battered by Small, seeing how badly she was injured, manufactured a fraudulent medical record and refused to diagnose Plaintiff with the traumas, resulted from the aggravated battery by the injection of the corrosive substance. Instead, it referred Jane Doe to another provider in its clinic. A couple of days prior to the appointment, Plaintiff got a call from the clinic that another provider, associated with Nelson, "needs to reschedule." The charlatanic physicians canceled Plaintiff's appointment 3 times by calling a couple days in advance although the appointments were scheduled weeks in advance due to them saying there was nothing else available. Later, Jane Doe learnt that in its system, the frauds marked her "4 times no-show" to ensure that they do not have anything to do with intentionally inflicted traumas and chemical burns. When Plaintiff asked why her chart does not have a valid diagnosis, Nelson's assistant stated that Nelson "will never write anything that would damage another physician's career."

25. Defendant Blake Booth, in conspiracy with other defendants and covering up disgusting criminal Small's attack, refused to sent the wounds, growths, and other contents that it surgically removed from Jane Doe's eyelids and that were caused by the battery with the injection of the caustic substance to an independent laboratory for analysis. It injected Plaintiff with an anesthetic, then announced that there were "no instruments" ready, then came back in 15 minutes and said that in will not, at Plaintiff's request, send the contents to the third-party lab. The contents and growths such as scar tissue and granulomas were attributed to the disgusting, cruel attack and are associated with severe ocular traumas. Booth manufactured a fraudulent bogus record in conspiracy with other defendants to ensure that no one would know or ascertain anything about the vicious attack by Small. While operating on Plaintiff, the clumsy charlatan removed a portion of Jane Doe's eyelid and further deformed it.

25. Defendant Blake Williamson referred or attempted to refer Jane Doe to Booth that surgically caused injury in addition to the injuries/deformities that have been already inflicted by Small by the way of the injection of the corrosive substance. In conspiracy with other defendants, it demonstrated commitment to criminal secrecy, medical record manufacturing, fraudulent diagnosis making to keep defendants-co-conspirators free from any criminal or civil liability and provide them with unjust advantage at further disadvantage to Jane Doe.

27. Ann Halphen who represented Small, Holloway, and Nelson and filed fraudulent papers in response to Plaintiff's complaint against the culprits as well as her associates, involved in the case and associated with Halphen for the purpose of representing the above-mentioned frauds are made unsued co-conspirators. Joshua Palmintier who represented Booth and Williamson and filed fraudulent papers in 3 months after the deadline to file an answer has passed as well as its

associates, involved in the case and associated with Palmintier for the purpose of representing the above-referenced frauds are made unsued co-conspirators.

28. Defendant William Morvant is a judge of the 19th JDC that hid the filed battery and fraud action against Small, Holloway, Nelson, Booth, and Williamson from the public. After waiting 6 weeks to no avail, Plaintiff filed a writ application with the Louisiana Supreme Court. As soon as Morvant received a notification of the filing, it ruled on the Plaintiff's filings, fraudulently backdating it 6 weeks ago as if it was signed 6 weeks ago. Although Booth and Williamson did not make appearance for 3 months, it denied a motion for preliminary default twice – the second motion was removed from the record and a misleading "minute entry" was used to "rule" on it – in 5 months after it was filed. It unlawfully dismissed the battery and fraud action under the guise of "prematurity pending medical panel review" however that fraudulent "medical panel" review would not preserve the battery and fraud claims, even if Plaintiff wanted to allow it to "review" it. There was no medical malpractice cause of action in the suit, and the opening of the suit as well as the entire lawsuit clearly stated that the action was brought due to "intentional infliction of physical injury under the guise of "providing medical services." Such nefarious actions of defendant Morvant violated all 3 most important canons of the Louisiana Code of Judicial Conduct: Integrity and Independence of the Judiciary, Avoidance of Impropriety and the Appearance of Impropriety in All Activities, and Performing the Duties of Office Impartially and Diligently. There is no integrity and "appearance of impropriety" has been avoided by hiding, falsifying, and removing the filings.

29. Dr. Laura Hetlzer who is a facial plastic and reconstructive surgeon and an otolaryngologist is also made a defendant in this complaint. Dr. Hetlzer told Weber that Plaintiff sustained ear injuries that are consistent with the way of the infliction, described by Jane Doe. That is why

Weber had to add more fraudulent fabricated statements to its pathetic crime cover-up investigative report as it informed Plaintiff prior to speaking to the doctor that should Dr. Hetlzer confirm the injuries – even just one injury – it will charge Poulicek with the crime: apparently, Weber expected and hoped that Dr. Hetzler will be just like all other frauds, known to it and will deny everything in order to not get involved in even a minimal way in any criminal/civil action. The deposition of Dr. Hetzler revealed that Weber asked her only one question after the doctor confirmed to it that Jane Doe suffered the injuries. Weber asked if those injuries could have been caused by "gentle rubbing of the ears." Dr. Hetzler said "no" and Weber the dirty cop wrote yet another one of its misleading falsifications that the doctor said that "the injuries could not have happened in the manor (sic) (Jane Doe) stated." Of course, Plaintiff never said that the cartilage of her ears was fractured by any "gentle rubbing." However, when Plaintiff wanted Dr. Hetzler to confirm many strong statements she made earlier, she, possibly under the however indirect pressure of her employers Our Lady of the Lake and/or Louisiana State University or just in pure solidarity and in conspiracy with her home state and all those people she knows well and who have either direct or indirect involvement in the crime cover up and other crimes, committed against Jane Doe, retracted or devalued some of her statements by claiming they were misunderstood or offered some ambiguous, inaccurate interpretation for those statements. Dr. Hetlzer's evaluation of the injuries and her testimony to Weber is of utmost importance and would be sufficient for the criminal charges to be filed against Poulicek which would also entitle Jane Doe to a summary judgement on the liability issues in a civil case against Poulicek. However, Dr. Hetlzer most certainly was not entirely truthful after realized or was told about the official crime cover-up. If it was not for Dr. Hetzler's evaluation of the injuries during the consultation in her office and her testimony to BRPD, and if the only "evidence" Jane Doe had was the one, provided

by sharps, nelsons, nakamotos, and other frauds, there would be a very slim chance to show the truth in this heavily dominated by lies, created by utterly unscrupulous defendants matter. As Dr. Hetzler ultimately joined co-conspirators and supported their cover-up when it became Jane Doe versus practically the entire state of Louisiana as no one would tell the truth, or even partial truth in that official crime cover-up, Plaintiff had to add Dr. Hetzler as a defendant to set the evidence and all the facts straight.

30. The Louisiana Attorney Disciplinary Board is a highly political, unethical, and inefficient unsued co-conspirator to whose attention the criminal and disgusting actions of eavesdropping on a "private attorney-client conversation" between Jane Doe and The Capital Area Family Violence Intervention center, Inc., known as IRIS Domestic Violence Center which it conducted with only one purpose – to allow Poulicek's "defense" to gather all information it wanted in conspiracy to cover up the crime – but never responded nor even lodged the complaint thus fully joined, covered up, and supported the criminals under the guise of law enforcement and their despicable actions.

31. The Advocate newspaper and its then "investigative journalists" Gordon Russell and Jim Mustian are the unsued co-conspirators that have been informed about the crime cover-up but after realizing that it was the official crime cover up, authorized by those in charge of "justice," joined other co-conspirators by remaining silent.

32. Katie Craft ("Agent Katie") is an FBI Special Agent who has knowledge of the crime cover-up but did not do anything but, as it appears, was/has been assisting defendants-co-conspirators with the crime cover-up. Since "Agent Katie" initially refused to give her last name to Plaintiff and only said it once accidently while calling Jane Doe in months after an in-person meeting, trying to "return" a copy of Weber's report, Plaintiff is not entirely sure if the last name is correct.

33. Unsued co-conspirator Southeast Louisiana Legal Services is another fraudulent, corrupt establishment with strong commitment to dirty "politics" and corrupt "politicians" whose mission statement is a lie and that is used to fulfil whatever dirty corrupt purpose the local government has at the moment.

34. Jill Craft whom Plaintiff contacted based on some advice and who collected some sensitive facts from Plaintiff is made an unsued co-conspirator as Jane Doe believes that it reported the incident of Jane Doe contacting it and seeking representation against law enforcement defendants-criminals to those same defendants.

35. Unsued co-conspirator John Edwards, a governor of Louisiana who was contacted by Plaintiff regarding the official crime cover-up but ignored Plaintiff's communication and joined other co-conspirators.

36. Unsued co-conspirator John Kennedy, a US senator for Louisiana who was contacted by Plaintiff regarding the official crime cover-up but ignored Plaintiff's communication and joined other co-conspirators.

37. Unsued co-conspirator Tom Aswell was used by defendants-co-conspirators to collect evidence of the crime cover-up from Plaintiff and a copy of Weber's investigative report in order to be used later as a "witness" who could claim that a different, newly manufactured copy, created after Plaintiff pointed out all inconsistencies by stating them verbally before/during the "protective order hearing" and by providing a detailed written analysis, accompanied by over 30 exhibits, was given to it by Jane Doe.

38. Franciscan Missionaries of Our Lady Health System, Our Lady of the Lake Physician Group, and Joseph Cefalu who represented Dr. Hetzler in the deposition are named unsued co-conspirators.

39. Unsued co-conspirators Con Poe 3 and Con Poe 4 are unknown judges that secretly signed the warrants that allowed law enforcement defendants to intercept Plaintiff's packages with electronic devices in order to unlawfully tamper with them and do the same at Costco where Jane Doe tried to purchase a laptop.

40. Unsued co-conspirator Everett Baudean is/was a private attorney who was enrolled to represent Poulicek in a civil legal action against Poulicek in 1 hour after Plaintiff filed her first lawsuit against defendants-co-conspirators on January 25, 2019 which was suppressed by the court and then unlawfully dismissed with prejudice but reversed on appeal by The US Court of Appeals for the Fifth Circuit.

## **FACTUAL BACKGROUND**

41. This case arises out of conspiracy among various law enforcement personnel, public officials, lawyers, judiciary, press and media representatives, individuals, licensed to practice medicine, and various clerks and assistants who work under the abovementioned to cover up the crime of violence, committed against Jane Doe by an employee of the Louisiana Department of Justice, and then physically attack Plaintiff with the dangerous weapon as well as injure her dog, intimidate Plaintiff, and deprive Plaintiff of the guaranteed constitutional freedoms when she was unwilling to be quiet about the crimes that have been committed against her under color of law by defendants and all others who have been assisting them. Finally, all those defendants and their co-conspirators have been fully committed to covering up what they did and minimizing any

possibility of the general public ever finding out about the events, detailed in this complaint, including but not limited to constantly eavesdropping on Plaintiff, barbarically deleting what she published online, deactivating her accounts, monitoring, controlling, and intercepting her emails and incoming/outcoming correspondence, sent via USPS, manipulating court filings such as hiding them from general public or not filing them into the record or deleting at a later time, not "ruling" on filings for months and even years, and then further manipulating the record to make it very difficult for any concerned member of the public to pinpoint those unlawful machinations.

42. The crimes of the repeated second-degree batteries that left Jane Doe with multiple ear cartilage fractures and deformities and resulted in loss of the part of her ear have been committed by Kyle Poulicek, a low-ranking, junior member of Medicaid Fraud Investigative Unit of Louisiana Department of Justice, shortly after Jane Doe announced to Poulicek whom she dated at the time that she became pregnant.

43. Plaintiff saw an otolaryngologist Dawn Sharp for the injuries' evaluation. Plaintiff showed her the injuries and she immediately confirmed: "It's broken, damaged cartilage." With what seemed as genuine concern and sympathy because of what happened to Jane Doe, she asked: "Was it a child (who broke cartilage in your ears)?"

44. After Jane Doe reported the crime of violence to Baton Rouge Police Department in August 2017, Officer Brian Hunter promptly, within a few minutes arrived to document the complaint. He wrote: "I met with a victim of a second-degree battery. She told me that her ex-boyfriend had damaged her ears from squashing and twisting them. The doctor's diagnosis: ear cartilage deformity, bilateral." "[Plaintiff] showed me lumps on her ears, damage she said was done by [Poulicek]."

45. The case was assigned to detective James Weber. From the very beginning, Weber started plotting crime cover-up and implementing the easiest and least incriminating ways to dispose of the case and shield Poulicek from any criminal and civil liability.

46. Weber called Jane Doe on August 30, 2017 and conducted a preliminary interview by speaking with Plaintiff for about 10 minutes as well as scheduled an in-person interview for the next day, August 31, 2017 at 6:00 PM. Next day, Plaintiff sent a text message to Weber's cell phone number in which she identified herself, provided a date/time the interview was scheduled for, and asked to reschedule and let her know about new date and time. Weber ignored the Plaintiff's message. After waiting for a few days to no avail, Plaintiff called Weber on September 5, 2017 and repeated the same information and question that was in her text message. Weber said it can meet tomorrow, September 6, 2017.  However, in its report it fraudulently wrote: "On 08/30/17 I attempted to contact the victim by phone using the number given in the report. I was unable to reach the victim." As Weber erroneously assumed that Jane Doe was not interested in coming down to the office for the interview, its false statement regarding "inability" to even "locate" the victim would have given it the easiest way to "clear" the case and cover up the crime.

47. Weber also wrote a series of other nonsensical, misleading, and false statements such as: "On 09/05/2017 I sent out a contact sheet in an effort to contact the victim" – Weber claims that it mailed a sheet a week after the personal telephone interview that was conducted on August 30, 2017. It also wrote: "On 09/05/2017 I spoke with [Plaintiff] via phone. [Plaintiff] advised she would come into the office for an interview on 09/06/2017." Weber was fraudulently creating an appearance of "not being able" to contact Plaintiff, erroneously assuming that she would not come for the interview until Plaintiff did come to the office. Neither of its comments make sense as it did not go the way Weber hoped for and it could not quickly "clear" the case.

48. The Plaintiff's interview on 09/06/2017 has been videotaped and Weber advised Plaintiff that it will be videotaped during the August 30th telephone interview. In the office, Weber announced when it was turning on and then turning off the cameras.

49. Weber voiced a "disbelief" that Plaintiff has been injured by Poulicek on account that Plaintiff "dated" Poulicek "for two months only." Weber kept repeating that since Plaintiff was in a "relationship" with Poulicek for a short period of time, he could not be the one who injured her. Weber stated that it conducted an "internet research" and did not find any "instructions" on the web how to inflict ear injuries. Weber "believed" that ear injuries could only happen during "wrestling" and "only wrestlers know how to do it [inflict ear injury]" and because Poulicek was "not a wrestler," he could not have inflicted the injuries.

50. During the interview, Plaintiff showed her injured ears to Weber and, while looking, it exclaimed: "Now I see, you did get injured!" Weber confirmed that it could see deformities, bruises, and discolorations on the Plaintiff's ears.

51. Plaintiff told Weber that she believes that Poulicek has a sadistic personality disorder and/or some other mental disorders/personality traits and that it is void of empathy and enjoys inflicting pain, suffering, and especially physical deformities. Plaintiff related to Weber that Poulicek had never been in any kind of romantic or sexual relationship and, contrary to mentally more or less normal male specimen gets excited while mutilating people and animals, even if only in fantasy and is not driven by sexual desire. Plaintiff told Weber that Poulicek enjoyed mutilation episodes from documentaries that it watched in a "police academy." Plaintiff stated that, in hindsight, she understands that Poulicek especially enjoyed duping her as she at first did not realize that it was destroying cartilage in her ears as it is completely void of nerves and blood vessels and, accompanied by pregnancy-related analgesia, was not painful at first. The inflammation would set

in and the ears would start hurting but it took some time to connect it to the batteries as Plaintiff had never experienced anything like that before and knew nothing about cartilage properties or cartilaginous traumas.

52. Jane Doe described to Weber a situation when she went hiking with Poulicek and there was no one in the woods and that she felt an unexplained fear of Poulicek and was uncontrollably shaking but, once again, shook it off and justified it by some "logic" as Poulicek looked so "good" and "safe" on paper and on the outside. Plaintiff believes that in that moment of isolation in the woods, Poulicek wanted to murder her, at least in its sick sadistic mind as, being a coward, it had not "graduated" to that level yet and did not know how to get away with it as it strives to maintain a façade of normalcy. Plaintiff described a few other situations to Weber and stated that she regrets extending, against her strong intuitive protest, an empathic consideration and kindness to the despicable subhuman and regrets for not walking away before it was too late.

53. Over the course of the interview and after asking Plaintiff more questions, Weber stated that it thinks that Poulicek "was punishing" Plaintiff "for something." Plaintiff said that it is possible that Poulicek was "punishing" her, for getting pregnant. Plaintiff offered a copy of the ultrasound result, confirming pregnancy but, not surprisingly, Weber refused to accept it as evidence. Weber also refused to accept the photographs of the pre-injured and post-injured ears, including the photograph of her and Poulicek that was taken in about 5 weeks into the "dating relationship" that clearly show that at that time Plaintiff's ears were still healthy, intact, and beautifully formed.

54. At the conclusion of the interview, Weber said that it was "[Plaintiff's] fault for getting into a relationship with that guy [Poulicek]."

55.  Weber wrote the following "investigative details:" "[Plaintiff] was certain that Poulicek has done this on purpose to cause the damage to her ears. [Plaintiff] had large deformities behind her left and right ears." There is no mentioning of the signs of a recent trauma that Weber observed and commented on such as bruises, discolorations, and contusions. There is no information in its "reports" regarding the fact that violence started when pregnancy was announced and no mentioning of the pregnancy.

56.  On September 11, 2017 Plaintiff emailed Weber, inquiring about the updates. Next day she received a message, left on her voicemail by Weber where it enthusiastically greeted Poulicek and informed it that it was a "suspect" with whom Weber wanted to speak. Plaintiff had to email the gormless "detective" and tell it that it left a message for the batterer on the victim's voicemail.

57.  As there were no updates from Weber, on September 21, 2017 Plaintiff emailed it and inquired what was going on with her case. On September 25, 2017, Weber responded that it "was unable to gather enough probable cause to charge [Poulicek] with a crime."

58.  Plaintiff requested a meeting with Weber's supervisor and on September 26, 2017 met with Charles Dotson. Dotson, exhibiting a demeanor of a misogynistic pompous jerk, proudly told Plaintiff that its "neighbor is a surgeon" and that it spoke with that "surgeon" who "told" it that it "takes years to cause ear injury" and that's why Poulicek could not have done it as Plaintiff had not known him "long enough." Plaintiff responded that it took Poulicek just seconds to inflict more than 20 ear injuries. Dotson, rapidly losing its patience, said that its neighbor knows better as it is a "surgeon" and Plaintiff isn't.

59. As Plaintiff continued rejecting nonsensical "logic" that Dotson was presenting, it then tried to convince Plaintiff that she has not been injured and, with a cretinous smile on its face, asked: "If he wanted to hurt you, why didn't he punch you in the nose?"

60. Plaintiff asked Dotson to accept evidence such as photographs that show that before Plaintiff met Poulicek and even weeks after, her ears were still healthy and intact. The photograph of Jane Doe and Poulicek, taken prior to the batteries would alone destroy a pathetic sloppy "theory" that Dotson and Weber came up with as an "explanation" to why they, in violation of the law, refuse to file criminal charges against Poulicek.

61. While Plaintiff still was trying to discuss her case with Dotson, it got up and ordered Plaintiff to follow it as it decided to escort her out of the building. Knowing that her rights of the victim of crime have been violated and the law also was being violated by unconscionable, ruthless individuals who were hired to "administer" the law but were doing just the opposite, Plaintiff tried to find out who was in charge of that "violent crime unit" and what was Dotson's name. Dotson seemed to completely had lost its cool but as in the lobby there were many not affiliated with police people, applying for documents and waiting in line, continued to "respond" to Plaintiff's questions in a parrot-like manner, "Thank you for coming, good-bye." People started looking and it handed its "business card" with its name on it to Plaintiff. There is no indication in those laughable, pathetic "investigative reports" that Plaintiff met with Dotson.

62. After being tossed out by Dotson and still unable to get police to even accept evidence as it was going against their dirty, corrupt agenda, Plaintiff found out the name of an individual in charge of "violent crime unit." Stephen Murphy was stalling, lying to Jane Doe, and otherwise fully assisting other criminals-co-conspirators with the crime cover-up.

63. Plaintiff explained in a very detailed email how erroneous all the "conclusions," given to her by detectives were, that they refused to accept evidence such as photographs, that they kept repeating nonsensical "it takes years to cause year injury" and "maybe it was an accident" such as if all over 20 injuries have been inflicted by Poulicek "accidently" and "not on purpose."

64. Murphy failed to address any of the Plaintiff's concerns and was lying through its teeth which it tried to masterfully cover up with empty promises and exaggerated pseudo-politeness. After waiting for over a month and still unable to get Murphy to review the case as it promised, Jane Doe emailed Murphy and received a response with more empty promises that one day her case will be reviewed. She waited more and then called Murphy only to hear some wild stories about a "hung cat" that prevented Murphy to review the case and that soon it "will dedicate the entire shift" to her case. Clearly that clowning and duping of Jane Doe amused Murphy.

65. When Murphy finally got back to Plaintiff, it said that it reviewed the case but will be unable to talk to Weber for a week. After stalling for another week, it finally emailed that needs a name and telephone number of the doctor who evaluated Plaintiff.

66. After nearly 2 more months of stalling, on December 28, 2017 Murphy emailed Jane Doe that Weber purportedly finally inquired about the security tapes in the apartment complex which Plaintiff told them likely captured some of Poulicek's attacks on the Plaintiff's ears. Murphy also wrote that Plaintiff's injuries were "inconsistent with (Dawn Sharp's) examination and evaluation" and that Weber "closed the case due to insufficient probable cause and physical evidence."

67. Plaintiff responded that she audio-recorded her medical appointments and it is very clear from the recordings that the doctor immediately recognized the injuries as consistent with ear twisting and

pinching. Jane Doe said that she saw another doctor, a specialist in ear reconstructive procedures who also repeatedly confirmed the injures and inquired multiple times about Plaintiff's safety, being concerned that Plaintiff could be still around the abuser who will continue destroying cartilage in her ears. Jane Doe asked that Weber interviews the second doctor and also asked for a copy of the "investigative report."

68. Murphy completely ignored everything that Plaintiff told it and only responded in more than a week that she must contact Lisa Freeman to get a copy of the report. While waiting for its response, Plaintiff already learned that she must submit a public record request to the proper department and faxed her request.

69. Freeman, then "legal adviser to BRPD" and a party to conspiracy to cover up the crime of violence, committed against Jane Doe, emailed Plaintiff on January 8, 2018 and stated that Murphy "contacted (her) office regarding" Jane Doe's public record request and said that Plaintiff must submit it directly to her "office." Plaintiff responded that she had already faxed the request several days ago but as Freeman maintained that she did not receive it, emailed the request again. Freeman then informed Jane Doe that they "will begin processing" it.

70. As those nefarious defendants-co-conspirators were determined to keep Plaintiff from getting the copy of their sloppy, misleading, fraudulent "investigative report," Freeman was well aware about the official crime cover-up and was instructed by Murphy and other individuals in charge of BRPD to stall and keep Plaintiff from seeing the public record.

71. Plaintiff informed Murphy that it did not address any of her concerns that she thoroughly described in her emails that point out to BRPD being inconsistent and providing nonsensical contradictory statements. As, in violation of the law, Jane Doe was denied access to public record

and "investigative reports," she did not know yet that defendants-co-conspirators created false,

misleading record and covered up the crime and every time she would contact an individual "in

charge" trying to get more information, they will stall, mislead, ignore her or lie to her, as

described in this complaint. Plaintiff also reminded Murphy of its promise "to set up a conference

in person upon completing (its) review," made on October 25, 2017 via email. Murphy again

ignored everything including its empty promise, made in writing, and told Jane Doe to make "any

further requests through" Freeman.

72. Weeks were going by but there was no response from Freeman's "office" and her assistant

Vasquez regarding the status of her public record request. Plaintiff went to the district attorney's

of 19th judicial district office and asked to speak with a prosecutor or a prosecutor's assistant. She

was not allowed inside the office and someone stepped out to the lobby and said that he was an

investigator for the DA's office and asked what she wanted. Jane Doe explained what happened to

her and that her case was dismissed improperly but she does not know the specifics as she is being

kept from seeing the "investigative reports." She asked the DA's office to step in and investigate

her case. The investigator told Plaintiff that they can't but that she should go back and ask BRPD

to reopen the case.

73. On January 22, 2018 Plaintiff met with "attorney" Caitlin Chugg who presented itself as "an

attorney for domestic violence victims." Chugg's supervisor, Knipe, was also present at the

meeting. The meeting had an ill vibe as all those disgusting, nefarious individuals were willing to

do was to take all Plaintiff's savings and assist corrupt, equally disgusting and nefarious "law

enforcement" in crime cover-up. Still believing that most people have at least traces of decency

and humanity, Plaintiff once again overrode her strong intuitive warning with "logical reasoning"

that it "could not be that bad and she must try and see if they can help," especially because Chugg

tried to appeal to her on a "women's solidarity" basis and other empty, phony but powerful sales pitches.

74. While taking all the Plaintiff's savings, Knipe clearly stated that the "DA office will be contacted tomorrow" on the Plaintiff's behalf which would be January 23, 2018. Jane Doe sent Chugg numerous photographs, files, documents that show that the crime that has been committed against Jane Doe went unpunished and started patiently waiting for an update.

75. On January 26, 2018 Jane Doe received a letter from the law firm where Chugg and Knipe worked with a bogus "representation contract" which vaguely stated that the law firm will be representing Plaintiff as a "domestic abuse victim in Baton Rouge City Court." Plaintiff immediately emailed Chugg and asked to confirm that, as agreed, Chugg will be representing Jane Doe in dealing with BRPD and DA office to ensure that justice will be served and Poulicek will be charged and convicted with the crime of multiple second-degree batteries. Jane Doe also informed Chugg that she will not be signing the "contract" that was mailed to her as it is misleading and misstates the actual agreement.

76. Chugg, not surprisingly, blamed it on the "staff error." It wrote that it "will be working with (Jane Doe) to try to secure prosecution of (Jane Doe's) assailant." Notably, as it would be expected in case of some "staff error," the contract was not replaced with the one with the agreed upon terms and the law firm just purposefully conveniently "forgot" about it as they were not successful in tricking Jane Doe into signing the bogus contract and were unwilling to come up with the genuine one as no one was about to represent Jane Doe in what was agreed upon.

77. Shortly after Plaintiff "hired" Chugg, she dedicated a great deal of time trying to explain in her emails to Chugg what happened to her. As Knipe requested a detailed written statement of all

events that pertain to her former "dating relationship" with Poulicek and the crime of the batteries, Plaintiff responsibly and diligently documented everything as asked. Plaintiff also pointed out each and every ridiculous inconsistency, stated to her verbally and in writing by Weber, Dotson, and Murphy. Jane Doe also sent Chugg some illustrations of the ear anatomy wanting to ensure that it understands the details. Little she knew back then that Knipe and Chugg were just mocking and abusing her as well committing the crime against her.

78. After waiting for two weeks, Jane Doe emailed Chugg, asking for an update as it was promised to her that the DA office will be contacted on January 23, 2018. Chugg responded that it was "still trying to communicate to BRPD" but refused to say anything else via email and told Plaintiff to call it. For over 30 minutes Chugg was attempting to brainwash Jane Doe by making more empty promises and lying that it must communicate first with BRPD as it would "enable" it to contact the DA. Plaintiff stated that during the in-person meeting that is exactly what Jane Doe asked for – to be represented at the meeting with Windham, an individual in charge of criminal investigations of BRPD with whom she was trying to set up the meeting as she thought it would be her next point of contact after Murphy wasted several months of her time, stalling and lying. Back then Chugg said that "as an attorney, (it) can go directly to the DA office." Now, it was claiming just the opposite as it was consistent with its dirty agenda of assisting BRPD and other "law enforcement" with the crime cover-up. Doubting Chugg's sincereness but having not much of a choice, she allowed Chugg to lullaby her into few more weeks of waiting and hoping that Chugg will start to represent her interests.

79. After weeks of waiting and repeated fruitless inquiries regarding the status of production of the requested public record files, on March 5, 2018 Chanita Vasquez responded to Jane Doe that Chugg "closed" Jane Doe's public record request. Plaintiff immediately contacted Chugg and

asked what was going on and why it closed her public record request without consulting with her and even informing her about it. Shockingly, despicable and nefarious Chugg claimed that it has done it to "keep the possibility of prosecution open," outrageously lying to Jane Doe that "if the record is obtained, (Poulicek) will never be convicted (because of that)," fraudulently masking its criminal behavior and assistance to BRPD with the crime cover-up as a "legal advice."

80. As a person who could not even imagine such a degree of moral filthiness, Jane Doe believed Chugg and contacted Vasquez to tell her that since her "attorney" tells her so, she agrees that her request be closed. Jane Doe genuinely worried for several months that if someone will request "public record" that pertains to her case, it will, as per Chugg, automatically disqualify Poulicek from ever being prosecuted for ruining her life. Keeping in mind that fraudulent Chugg's "legal advice," Jane Doe even emailed Vasquez, asking if it could accept a request that the file will not be released to anyone and tried to appeal to it on the basis of the privacy issues, citing personal humiliating details of the case, such as abortion and facial disfigurement. Of course, Jane Doe had no idea that none of it was in that bogus "investigative report" as she was being unlawfully kept from seeing it. Vasquez and its supervisors once again ignored Plaintiff's correspondence.

81. Filthy Chugg, with approval of its equally filthy supervisor Knipe, after abusing and defrauding Jane Doe for over three months during which they were actively working against their "client," committing crimes against Jane Doe, and aiding corrupt law enforcement criminals, were terminated as Plaintiff's "attorney."

82. Jane Doe emailed Weber several times, telling it that it closed her case improperly, failed to accept evidence and failed to investigate such as interview Dr. Hetzler. Plaintiff patiently waited for couple of weeks before sending another email however Weber kept ignoring Jane Doe.

83. Plaintiff sent a letter to the district attorney's office, addressed to Hillar Moore, and requested to review her case and bring her batterer to justice. After waiting for over a month, she tried to call first but was unsuccessful and then went there in person and told the receptionist that she sent a letter but never heard from them. Just as before, she was not allowed inside nor allowed to speak with a prosecutor. Instead, somebody who "works with victims" stepped out to speak with Jane Doe. Completely useless, either on purpose to just brush Plaintiff off or really so poorly informed, the "victim worker" just wasted Jane Doe's time and said that they did not receive her letter without even asking who she was and refused to check their records when Plaintiff specifically requested.

84. Plaintiff called the prosecutor's office in Baton Rouge City Court and someone told her that they will connect her with Stokes, a "high-ranking BRPD officer who investigates domestic violence cases." Jane Doe was told that Stokes will get in touch with her. Plaintiff waited for over two weeks and decided to call the helpful person again. He said that "Stokes is usually very good with following up" but that he will email her again and remind. Stokes called Jane Doe shortly after that, interviewed her, and told her that she will remind Weber to respond to her emails. Weber emailed Plaintiff that "it will hear more evidence" and told Plaintiff to come to its office and bring all those recordings Plaintiff repeatedly was telling it for months but it continued ignoring her until Jane Doe spoke with Stokes and Stokes filed a supplemental report into those investigative files of which Plaintiff did not know but found out on August 8, 2018 when finally got a hold of a copy of the reports thanks to Sarah M Smith.

85. Weber scheduled the meeting couple of weeks in advance and told Plaintiff to come by on April 24, 2018. She met with Weber and Murphy and the two wanted to copy the audio recordings of the Plaintiff's appointments with Sharp where Sharp confirms the injuries and then, when Plaintiff

confronts it regarding either removal or modification of a "bilateral ear cartilage deformity" diagnosis, it tells Jane Doe and repeats three times that it "can't get involved in any legal issue."

Weber and Murphy also copied the recording of the appointment with Dr. Hetzler where the doctor makes over a dozen of strong statements regarding Plaintiff's injuries that would absolutely destroy BRPD's pathetic crime cover-up, if brought to light or used as evidence. Knowing it, the culprits wanted to copy the recording "from the original device" and then discredit the strong evidence by lying that it was "altered." Murphy exhibited evil happiness on account of duping the Plaintiff.

86. Once again, against her very strong intuitive protest, Plaintiff convinced herself that it was probably okay and allowed Hunt from the BRPD digital lab copy the recordings from both her laptop and her phone. It was a long process as Hunt did not seem to know how to do it and could not do it until Plaintiff came up with the suggestion and showed it how she transfers files from her smartphone to the laptop. Technically, it was not even copied from the "original device" as the report made it look like. It was copied twice – once from the laptop and the second time from the smartphone through the laptop when Plaintiff connected her laptop to her phone through wi-fi and Hunt retrieved the files from the laptop, using a flash drive. Somewhere in the middle of the process when Plaintiff asked if she may withdraw her consent as she was given a document to sign – deceitful defendants wanted to make sure that everything looks "official" and they have all kinds of bogus documentation - where it was stated that Plaintiff can abort the copying event at any time until it's finished and withdraw her consent. Weber said that no, Jane Doe cannot withdraw her consent and must give it to them so that Weber "know(s) what questions to ask Dr. Hetzler."

87. As Jane Doe was being denied access to public records, she did not learn about it right away but later, when acquired a copy of the reports through Sarah M Smith on August 8, 2018, learnt that Hunt created a misleading report, insinuating without stating it directly that the recording were not "genuine." Those events will be more fully addressed in the portion of the complaint, dedicated to the staged protective order hearing.

88. Although Weber had a very detailed doctor's narrative that it copied from an "original device" that provides not just a strong basis for probable cause but would be sufficient to put Poulicek behind bars for a couple of years, Weber still claimed that it "had nothing to further investigation with" and wanted to speak with Dr. Hetzler personally and Plaintiff, of course, gave it her consent.

89. It appears that Weber expected that Dr. Hetzler will lie and deny seeing traumas on the Plaintiff's ears just like it itself or any other fraud it knew or spoke to would. As it planned to "exclude" the recordings – all that jumping through hoops and grooming Jane Doe so that she will let go of her heightened awareness of their evil motives and go along with what they were asking of her -- copying them was not for nothing and was done in order to fulfill the criminal agenda. Copying the recordings from the "original device," excluding" them for good as they were copied from the device they were recorded with, and then obtaining a deceitful testimony as Weber hoped for will bring to the end the crime cover-up event to which Weber along with its supervisors dedicated so much of its time and meager ingenuity due to Plaintiff's persistence and dedication to the truth and justice. The very last thing that Weber stated to Jane Doe on April 24, 2018 was the following: "If Dr. Hetzler says that you have just one injury, I will charge (Poucliek)." Weber specified the number of the injuries because Jane Doe was trying to ensure that Weber understands exactly how many injuries she sustained, where they located, etc. It was not

important to Weber, it could not care less about Plaintiff's injuries or documenting them correctly. Instead, it had a certain plan as Plaintiff described above. That's why trying to finish with Plaintiff as soon as the recording were copied, it said that if the doctor confirms just one injury, it would be sufficient.

90. Since Dr. Hetlzer, to Weber's surprise, confirmed the injuries, it went ahead with a sneaky question in order to write yet another lie in its fabricated report. According to Dr. Hetzler's testimony, taken at July 31, 2019 deposition, Weber asked if Plaintiff's injuries could be inflicted by "gentle rubbing of the ears." The doctor said no and Weber wrote its fabrication and "cleared" the case: "Dr. Hetzler advised the injuries could not have happened in the manor (sic) (Jane Doe) stated." Plaintiff never said that her ears were "gently rubbed." At all times Plaintiff kept repeating that the ears were pinched and twisted. It all has been documented by the original report, written by Officer Hunter, Plaintiff's email correspondence with BRPD and other law enforcement agencies, multiple videos, made by BRPD's body worn and other cameras, and more.

91. After speaking with at least a dozen of various individuals who work in either "legal" or "law enforcement" fields and hearing from them that they never heard of such nonsense as obtaining public record precludes the possibility of prosecution of the batterer, Plaintiff stopped believing the outrageous, criminal lie that was provided to her by Chugg under the guise of a "legal advice" in conspiracy with corrupt BRPD and Louisiana Department of "Justice" and resubmitted her public record request. Not surprisingly, it was ignored. Plaintiff kept waiting and then repeatedly contacting the BRPD "legal division" regarding a copy of the report but it continued unlawfully denying Jane Doe access to public record.

92. Plaintiff contacted John Windham, an individual in charge of BRPD's "criminal investigations" and requested that her case will be reviewed. Windham ignored Jane Doe's written correspondence as well as made itself "unavailable" at all times when Jane Doe tried to reach it over the phone and never returned Plaintiff's calls.

93. On June 12, 2018 Plaintiff contacted chief of police Murphy Paul Jr. with the request to review her case. No response was received from it.

94. Plaintiff then contacted Jeffrey Landry, attorney general of Louisiana and asked it to bring its employee who repeatedly battered her, to justice. Jane Doe also contacted Patrick Magee, criminal division director of LADOJ, and Ronald Beaver, chief investigator of Medicaid Fraud Control Unit, a direct supervisor of Poulicek with the same request. Jane Doe, to ensure the receipt of her communication, contacted each of those LADOJ defendants-co-conspirators via both fax and electronic mail. No response was provided to Jane Doe's correspondence.

95. Notably, filthy Chugg, since proving her commitment to deceit and corruption, has been "promoted" and now works for Landry in one of many ineffective and incompetent "branches" or "affiliations" of LADOJ, so-called "Child Advocacy Program." Chugg's duties are described as "represent(ing) abused and neglected children who have been removed from their homes and/or families and are in the custody of the State." That is certainly concerning as abused children deserve true advocates with unparalleled moral compass on their side and not disgusting criminals under the guise of such "advocates."

96. After realizing that no one in either BRPD, DA office, or LADOJ will investigate or review her case and will not bring Poulicek to justice, but on the contrary shielded Poulicek from any criminal or civil liability and demonstrated that no matter what it does, it will not be held

responsible and may come back and batter Plaintiff some more, if it so desires, decided to apply

for a protective order. Jane Doe wanted to obtain the protective order that would forbid Poulicek

to come anywhere near her shortly after Poulicek battered her and Officer Hunter repeatedly

suggested that she does so. Being utterly devastated and distraught due to what happened to her

and trying to come to the terms with that, she did not want to even think about being in the same

room with Poulicek or having to look at the bastard who caused her so much harm. Following

Officer Hunter's advice she, however, still phoned the "domestic violence department" of the 19th

Judicial District Court to inquire about the procedure to obtain the protective order. She was told

that she will have to come to the court early in the morning and be prepared to spend there the

entire day. Officer Hunter instructed her to give the domestic violence department the criminal

report's number, telling her that they will be able to see it in a few days after he files the report.

Jane Doe did exactly as Hunter suggested. However, "domestic violence" could not find the report

or any information. They then asked Plaintiff to explain "what happened." Plaintiff briefly

explained and an individual on the phone started laughing. As Jane Doe did not have emotional

capacity to sit in the court whole day and be laughed at by those who supposedly were there to

help victims and also be in the same room with Poulicek, she decided to postpone applying for a

protective order.

97. When it became apparent that BRPD or other law enforcement agency will not bring Poulicek to

justice, Plaintiff concluded that maybe at least obtaining the protective order will increase her

chances to never be battered by Poulicek again although she doubted that Poulicek who she

believed enjoys hurting living beings could be stopped from committing violent crimes by some

order. Since it had been a year since the batteries and Jane Doe was in the process of healing –

both physically and psychologically – and felt stronger and was no longer intimidated by being

laughed at by "law enforcement" and after dealing with it for a year, learned so much about life, what people really are, and felt as if she was 30 years older than before she met Poulicek and had to endure the batteries and the dirty dealings of individuals in charge of "justice." Jane Doe did not know that everything was just getting started.

98. Plaintiff applied for a protective order and the matter was set for the hearing. The papers that were handed to her by "domestic violence" department of the 19th Judicial District Court had a "greeting" from IRIS domestic violence center, stapled to the front page of the court papers that read as such: "On the day of your hearing there will be an advocate by your side to support you so you won't be afraid to face your abuser." That empty promise could not be farther from the truth as Jane Doe learned that IRIS is run and controlled by precisely the same corrupt public officials that run and control BRPD, LADOJ, DA office, etc., and while operated under the guise of helping violence victims is actually used as a "cover" for their criminal dealings, if and when needed.

99. When Plaintiff showed up in the courthouse for the hearing on August 8, 2018, she was told by an IRIS assistant to go to the room where IRIS "interviews" domestic violence victims. The assistant pointed to the semi-open booth and said that an "attorney" will come to speak with her. While waiting, Jane Doe noticed that two men in suits situated themselves directly at the booth's opening. She thought it was odd and made her feel uncomfortable. Shortly after Cavalier, IRIS-employed "attorney," entered the booth and started "interviewing" Plaintiff. Cavalier was not listening to what Jane Doe was saying but instead was frequently "making a conversation" with two men in suits at the booth's opening by frequently smirking and glancing at them with its eyes, displaying evil hatred. Plaintiff turned around and saw two men leaning into the booth's opening and carefully listening to everything Jane Doe was saying. Now she felt very uncomfortable and

everything what was happening did not feel or seem right. After Cavalier finished its phony "interview," it "declined representation" of Plaintiff. Jane Doe asked why they "represent 90% of domestic violence" cases – according to the supervisor of "domestic violence" department of the 19th JDC Con Poe 1– but decline to represent the victim whose injuries amounted to a maim. Plaintiff then told Cavalier that she wants to speak with its supervisor. Cavalier told Jane Doe to take a seat and wait until the supervisor will have time to see her.

100.        Plaintiff took a seat and started waiting. While waiting, she saw Weber, dressed in a comfortable casual attire walking into the room. Weber carried some letter size papers. Plaintiff then observed Weber, two men in suits who were just eavesdropping on her conversation with Cavalier, the supervisor with whom Plaintiff was about to speak, and Cavalier chatting for about 10 minutes. Then, Weber handed the papers that it brought with it to the supervisor and started walking towards the room's exit. While passing Jane Doe, disgusting dirty cop slowed down, looked Plaintiff's in the eye, and loudly clicked its tongue.

101.        Plaintiff was confused, in disbelief, and in shock since at that time she still did not know the extent of the evilness of the "law enforcement" she dealt with and did not know for a fact that Weber and other criminals under the law-enforcement guise have been openly, actively protecting Poulicek and have been carrying out the official crime cover-up, not just doing some sloppy, negligent "investigation" due to laziness, lack of motivation, or lack of intelligence. Weber and others had been psychologically masterfully manipulating Plaintiff to make her think that "they are the good guys" but her "doctors denied" the injuries, thus "the good guys' hands are tied." It just dawned on Jane Doe that Weber deliberately came to testify against her, and that everything what it did and the way it presented itself to Plaintiff was a complete ruse. That past year was so

difficult and exhausting for Jane Doe as she tried so hard to "prove" her injuries to that "law enforcement" and endured so much of a psychological manipulation and abuse from those people.

102.     It seemed as Weber came to the courthouse on its day off, brought its phony report with it, and was willing to waste at least a couple of hours, presenting its falsified report and testifying against Jane Doe. That is a lot of effort and only now Jane Doe started to slowly realize that Weber's "investigation" was so much more than a "sloppy investigation by a not-so-bright cop" with questionable ethics.

103.     Still in disbelief to just see Weber walking in on its day off and clicking its tongue at her, Plaintiff approached Cavalier who was just standing in the middle of the room and asked what Weber was doing there. Cavalier said that Poulicek "subpoenaed" Weber to come. Of course, there were no subpoenas issued and Weber came on its free will.

104.     Finally, the legal director, after finishing her friendly chats with dirty cops and dirty "lawyers" and finishing her early morning tea ceremony, was ready to speak with Plaintiff. Sarah Margaret Smith, while looking at the papers that have been just handed to her by Weber, said that, "according to this," Jane Doe doesn't have any injuries. Jane Doe could not believe her eyes – was it that report that she has been trying to get for eight months and which BRPD was so determined to keep Plaintiff from seeing? Jane Doe asked if she may look at the report. Smith said that she will let her read the report. Plaintiff started reading and immediately started noticing fabrications, lies, misleading statements, and evidence omissions and started openly commenting on particular statements from the report saying that she can prove that the report is a falsification in its entirety. Jane Doe was aware that everyone could hear her but she still wanted to believe that she was among people who are trying to help violence victims. Smith said that all what Plaintiff says or

the evidence she has doesn't matter since "there will be a police officer" and Jane Doe in the courtroom. Smith asked Plaintiff: "Whom do you think the judge will believe?"

105.    Plaintiff asked Smith if she may get a copy of the report as she has been trying for many months to obtain it through the public record requests procedure but was unable to get it. To Jane Doe's surprise and joy, Smith said that she will make her a copy and stepped out of the room. Shortly she came back and handed the copy of the entire report to Plaintiff. Jane Doe continued waiting to be called to the courtroom. While waiting, one of the individuals that eavesdropped on Jane Doe's conversation with Cavalier approached her and introduced itself as Brenden Craig, "attorney for Poulicek." It asked if Plaintiff wanted to "discuss the case." Several minutes later, the second eavesdropper who also happened to be Poulicek's "attorney," Tyson, approached Jane Doe and told her that it was time to go to the courtroom.

106.    In the courtroom, "subpoenaed" – according to Cavalier – Weber was nowhere to be found. Clearly, the corrupt coward left because Plaintiff got a hold of the report and started openly and loudly saying that Weber's pathetic sloppy "investigation" is full of misleading statements, evidence suppressions and omissions, and even outrageous fabrications and that Jane Doe intends to question Weber regarding all that during the hearing. At the hearing, while asked by Woodruff-White, Plaintiff once again stated that she just got the copy of the report which is "full of lies" and she wants to question Weber about it and intends to prove that it is "full of lies."

107.    Craig and Tyson started mumbling incomprehensibly, evading the question why their "subpoenaed" witness was there but disappeared. Since IRIS just "turned down" Plaintiff, Woodruff-White decided to continue the hearing. Craig repeatedly objected and first claimed that Plaintiff "was told" by IRIS earlier, not after it "interviewed" Plaintiff so that Craig may eavesdrop on what was supposed to be a confidential "attorney-client" conversation and then

claimed that the hearing should not be continued since Plaintiff "had two hours" between when she was "turned down" and the hearing to find an "attorney to represent" her.

108.    Undoubtedly, during the first hearing (that was rescheduled), Woodruff-White was not yet tipped off and was not asked for a "favor" by one of its friends in BRPD or LADOJ or another similar organization to make a mockery of justice and deny the protective order in a physical violence, amounted to a maim case. Defendants co-conspirators were confident that it would not be needed and that's why Weber came to "testify." It did not go the way they planned and the only way to have it their way now was to make an arrangement with the corrupt judge through a personal favor for a high-ranking co-conspirator.

109.    Not only Woodruff-White's actions during the first, original hearing seemed to be fair and impartial contrary to the second hearing as it would appear to any unbiased reasonable mind, but also Poulicek's appearance and behavior was a perfect telltale: a sadistic but cowardly creature was constantly pacing, looked like it had not eaten for a week – the malefactor realized that just maybe justice would occur and it will have to at least partially pay for what it has done and all its "law-enforcement privileges" such as carrying firearms will be taken away from it. Notably, at the second, 100% staged mockery-of-justice-hearing where Woodruff-White exhibited a nefarious conduct, Poulicek appeared, looking as an utterly content guest of honor: it was told by BRPD and its LADOJ supervisors that everything has been taken care of for it and its disgusting crimes will continue to be covered up.

110.    In 40 minutes after the first hearing was rescheduled, Nakamoto, a fraudulent caricature of an "investigative reporter" that serves corruption and assists public officials in crime cover-ups and other criminal, underhanded acts while presenting itself to the public as, ironically, "the

number one corruption fighter," started calling and emailing Plaintiff and demanding that she comes to its office and brings "all evidence" that pertains to crime cover-up.

111.    Plaintiff repeatedly contacted Nakamoto in the past but after collecting some information from her and reporting to corrupt public officials, made defendants in this lawsuit that some Jane Doe is requesting that an independent "journalistic investigation" will take place, stopped responding to Plaintiff. This culmination of the corrupt evil deserves special attention as although many people seem to be of opinion that "all police is hopelessly corrupt" and aren't of much higher opinion of other public officials, many hold dear such values as "freedom of the press," "freedom of the speech," "democracy," and "controversy." They erroneously believe that such values are faithfully guarded by the press. There is likely a large number of deceived trusting souls, robbed and betrayed by nakamotos.

112.    Plaintiff did not believe that Nakamoto has a genuine "journalistic interest" and told it to come to the hearing in two weeks, on August 22, 2018 and see everything for itself, since it suddenly was so interested to find out if it "could do a story about" the events that Plaintiff describes. Of course, Nakamoto did not come to the hearing nor sent any of its assistants.

113.    On July 25, 2018 Plaintiff contacted The Advocate newspaper and talked to Jim Mustian and Gordon Russell, a managing editor in charge of "journalistic investigations." They were very interested in talking to Plaintiff until realized that the events she was describing was an official crime cover-up. After that they immediately started ignoring Plaintiff. Unsued co-conspirator The Advocate was not joined as a defendant in this complaint because although isn't not true to the freedom of speech and press principles and nearly always is "politically correct" unless paid handsomely or otherwise is profiting from bringing a controversial or incriminating story, it did not try to trick Plaintiff and/or collect any evidence from her like Nakamoto did.

114.    Shortly after the hearing was rescheduled, Plaintiff subpoenaed Weber, Hunt, Officer

Hunter, and Dr. Hetlzer to come to the hearing and testify. Officer Hunter resigned and moved out

of state. Other 3 witnesses were properly and timely served with the subpoenas.

115.    While sitting in the courtroom for several hours, Plaintiff got to observe the dealings of the

miserable Woodroof-White's court where any questionable character, represented by however

inadequate, gormless, and scumbag-y "lawyer" automatically received favorable rulings. Provided

that IRIS, the den of evil that is directly involved in all repulsive, dirty "political" games declines

representation of true victims and even abuses and tricks them as it did to Jane Doe, there is no

wonder why suddenly the abused are not represented or that IRIS "drops" clients and withdraws

in the middle of the hearing. The absence of a "representation" by some unscrupulous and dullard

"lawyer" is not by any means a reason in itself for the victims' abuse by Woodruff-Whites' court;

rather, it is just a "ritual" that Woodroof-White and corrupt to the core IRIS adapted to conceal the

true reasons. Among many other things, the sad operation that Plaintiff observed is a well-oiled

machine for supplying however unscrupulous and inadequate "members of the bar" with work

and automatically disfavoring or being extremely prejudiced, in violation of the US Constitution,

to those who want to represent themselves. Notably, in the type of the "legal action" that should

be available to anyone – not just made look like it is available. Worth mentioning that Jane Doe's

case is different in many aspects: first and foremost, it was (and is) the official crime cover-up.

The reason for this elaboration is to state what was observed: not only Jane Doe has been

mistreated, abused, and tricked under the guise of "helping domestic violence victims" but there

are other victims some of which get automatically disfavored because they are not represented by

a "lawyer."

116.    Not a single served witness appeared as ordered. When the case was called, it was past noon. While Plaintiff was sitting and waiting, she also was looking around to see if any of the subpoenaed witnesses will show up. She did not see anyone in the early morning nor later in the day.

117.    Plaintiff first moved for disqualification of Craig and Tyson, attesting to Woodruff-White that they were eavesdropping on her what was supposed to be a confidential attorney-client conversation 2 weeks ago, on August 8, 2018 and filthy Cavalier as well as the remainder of the IRIS's staff, void of integrity, were shamelessly aiding them with committing the crime.

118.    Outrageous Tyson reacted with uncontrollable anger to the absolute truth regarding its disgusting behavior and unrepentant Craig mumbled that it was "not surprised" and "expected something like that." Woodroof-White expressed its support for sizzling with anger Tyson by saying: "I understand, Mr. Tyson. I am frustrated too but I have to deal with it." Then it went through the motions and "addressed" the motion by quickly denying it.

119.    Plaintiff informed that she timely subpoenaed 3 witnesses and neither was there and that the law clearly states that if a material witness made itself unavailable – and in this case all 3 witnesses made themselves unavailable – the continuance should be granted. Woodruff-White said that it "will render judgement" and that it "will render it today."

120.    Plaintiff was ordered to get on a witness stand and start answering questions. Knowing that her civil rights are being violated, the law is being violated by scumbags that are, ironically, acquired the position to "represent the law," and that she is being abused under the guise of the "legal proceedings," firmly stated that it is her right to have her timely subpoenaed witnesses who are material to her case present. Woodruff-White turned on some horrible loud static noise that

was playing on and off the whole day, probably so that sensitive recording devices will not pick up on any nasty, evil, and corrupt behind-the-scenes comments and appeared to be looking at the monitor of its computer. In a few minutes, it started mumbling something likely intentionally incoherent so that the deception of the comments will be lost between all unintelligible utterances. The message that could be discerned out of all that was the following: "only two were served." Notably, probably not even remembering what it already said, two more versions regarding the service of the witnesses were offered by it throughout that long hearing with frequent breaks, including a long lunch break: that "only one was served," and then, finally "no one was served."

121.    Plaintiff stated that she has a proof of service, provided by the sheriff's department but Woodruff-White said something incoherent in a demeaning, patronizing, or even joking manner to present Plaintiff's statement as some silly comment by some silly self-represented litigant that does not even understand what she is doing there.

122.    What happened after, could be described as a show that some deranged, abusive freak was putting on for the audience. The room started to get filled up with many people who looked like the courthouse employees or some "lawyers." Woodruff-White started asking various questions, including uncomfortable and embarrassing ones. For example, it ordered Plaintiff to explain in detail how all over 20 ear injuries were inflicted. Craig and Tyson, two scumbags, objected to everything Plaintiff was saying and all but one invalid objections were sustained. Poulicek was not asked a single question of which it already knew as it was told that everything was taken care of for it and that some judge, after putting on a show, will dismiss the action at no cost to it. Poulicek was proudly sitting there, with the disgustingly contentious face of a criminal who is a part of the gang that took care of it and made everything "go away" for it.

123.    As Plaintiff continued repeating that the law is being violated and she subpoenaed her witnesses but they were not there, Woodruff-White continued presenting Plaintiff to the audience as some rebellious individual who is so dumb that does not even understand what is going on. To help the poor dummy, Cavalier was asked to approach and "provide legal advice" which was presented to the public as an unbelievable kindness and willingness to help. Plaintiff rejected filthy Cavalier's "legal advice" and repeated that she was not asking for any advice or any assistance but clearly stated that the law was being violated because she was not allowed to have the testimony of her subpoenaed witnesses.

124.    Next, a bailiff was used to present Plaintiff in bad light. The bailiff started straightening out Plaintiff and trying to shame her for "not respecting authority," and threatening with violence in whatever "lawful" form it is used to silence or remove unwanted or uncooperative witnesses from the courtroom. Since none of those deceitful and intimidating tactics worked and Plaintiff continued insisting that she was not awarded the prescribed by law opportunity to have a fair hearing, Woodruff-White decided to show Plaintiff that she "is having a fair hearing."

125.    Woodruff-White stated that the two subpoenaed detectives will be phoned and asked whether they will be able to come to the courthouse. After that announcement was made, Weber and Hunt appeared in the courtroom in a remarkably fast fashion.

126.    Plaintiff was permitted to ask them a limited number of questions, when they did not want to answer they just sat there in silence and Plaintiff was ordered to ask next question. When Weber and Hunt lied and it was clear how pathetic, inconsistent, and nonsensical their testimony was, or when they would change the answer, confronted by the audio-recording of themselves stating the opposite (no audio recording were allowed to be played or submitted as evidence), it, as expected and as part of the official cover-up, was dismissed and disregarded as if the judge was

incapable of comprehending the case or recognizing what was going on. Craig and Tyson continued to make abusive, baseless, and invalid "objections" to everything and all "objections" during witness questioning were sustained.

127.     Weber perjured itself while answering questions "under oath" countless times. This is just such a vivid portrayal of Weber, its "oath," and the entire East Baton Rouge Parish and State of Louisiana "law enforcement," what it is, and what it represents.

128.     When asked if "large deformities" were the only signs of trauma Weber observed, it said, "yes." When Plaintiff asked Woodruff-White is she may play a recording of Weber commenting that it observed bruises, discolorations, and contusions on the Plaintiff's ears, Woodruff-White said in a whining voice that it does "not want to listen to (any) recordings" and Weber "corrected" its answer and said that it did see the early signs of injury. When Plaintiff asked why it was not documented in that pathetic phony "investigative report" it manufactured, Weber sat in silence with a proud, contemptuous look on its face. Woodruff-White whined: "But he is not a doctor" insinuating that a police officer does not have an obligation to truthfully document its observations of traumas, especially its early signs that are often most telling and important and ordered Plaintiff to ask next question.

129.     Plaintiff asked Weber why it gave Poulicek a copy of its phony "investigative report" on the same day it was served with the TRO papers which may be ascertained by the stamp on the reports – July 27, 2018 – but has been denying Plaintiff access to those reports for 8 months. Weber, with a disgusting grimace on its face, sat in silence. Woodruff-White, assisting fraudulent corrupt detective, said that Jane Doe can ask Weber about it some other time and ordered Plaintiff to ask next question.

130.     Plaintiff asked Weber if it heard that on the recordings of the appointments with Dr.

Hetzler, the doctor was concerned with Plaintiff's safety and asked repeatedly – at least 7 times –

whether Plaintiff was still around the individual who broke cartilage in her ears and whether she

felt safe and was in a safe place. Weber outrageously lied by saying that no, it did not hear that but

only heard that Plaintiff said that she was an "abuse victim" and then was asked if she "was

okay."

131.     When asked what it heard on the recordings of the medical appointments and if heard that

the doctor confirmed the injuries, Weber attempted to evade the question but finally said that it

"couldn't use the recordings because they were altered." Weber refused to say how they were

purportedly "altered" and Woodruff-White prevented Plaintiff from insisting on the answer and

asking uncomfortable, incriminating questions that interfere with the official crime cover-up.

132.     Later, Weber's and Murphy's supervisor Carey was repeatedly contacted with the request

to provide an explanation and proof that the recordings that the entire department went to extra

trouble to collect by duping Plaintiff and pretending that it needs it "for investigation" were

"altered." Defendant-co-conspirator Carey shamelessly ignored Plaintiff's requests as if she was

an annoying pest and not the individual, contacting it solely in its official capacity, concerning

exclusively the matters, related to its work as a "public servant" and high-ranking police

employee.

133.     Hunt, the second subpoenaed "detective" who copied the recordings from both Plaintiff's

laptop and her phone, created ambiguous, full of misleading statements "report." It intentionally

wrote that the dates of the recordings' creation were "inconsistent with the stated dates." Of

course, the dates that Hunt listed are the exact dates of the Plaintiff's medical appointments and

the recordings, made in Dr. Hetlzer's office were fully authenticated by Dr. Hetlzer during the

deposition and were not modified or altered in any way. As just even the recordings themselves

nullify the entire fraudulent "investigation" and clearly show how pathetic, corrupt, and crooked

Weber and all other fraudulent "policemen" in this complaint are, those defendants had only one

way of handling it -- something they do for a living -- lie, lie, and then lie some more under the

guise of "enforcing the law" and "delivering justice." That was the entire goal behind copying the

recordings "from the original device" and the reason why Murphy was exhibiting an evil

excitement that it was duping and abusing Plaintiff -- just putting a few misleading statements that

suggest that the recordings were not genuine or "modified" would "exclude" the evidence that, if

brought to light, would make the crime cover-up problematic.

134.    Plaintiff showed Hunt the dates on the summary visit pages that matched precisely the

dates that Hunt determined by metadata. Plaintiff asked Hunt if it sees that its report is inaccurate,

misleading, and nonsensical and it firmly responded, with the face, twisted to display disgust:

"No." Woodruff-White said that it was Plaintiff's fault as she "stated inaccurate dates" to Hunt.

Hunt said that it was Weber who stated those inaccurate dates.

135.    Woodruff-White allowed Plaintiff to ask "two more questions" and after that said that the

law enforcement liars who just swore to tell the truth but outrageously lied, just like in their

reports and generally in all aspects of this disgusting, criminal crime cover-up were free to go.

136.    As yet another break was announced, as soon as Weber got off the witness stand, it

approached Poulicek and its two scumbags-lawyers and openly displaying closeness and intimacy

of their relationship, with a distinct warmth in its eyes enthusiastically shook their hands and then

chatted.

137.     With the complete understanding of its disgusting actions of the crime cover-up,

conspiracy, shocking abuse of discretion and mistreatment of Plaintiff, the crime victim that was

just abused some more under the guise of the "court hearing," Woodruff-White ordered Plaintiff

to pay $2000.00 to scumbags-eavesdroppers and compensate the criminal that maimed her for its

"legal expenses." It also ordered Plaintiff to pay all court fees most of which originated from

requested subpoenas to which neither subpoenaed witness even responded. The eventual

"appearance" of Weber and Hunt that came nearly 6 hours after the time they were ordered to

appear to put on a show and abuse Plaintiff once more is not a proper response of a subpoenaed

witness.

138.     Plaintiff filed a notice of supervisory writ and also expressed the intent of filing one in

open court stating that she was being denied access to courts and her rights were being violated

and she was suffering an irreparable injury as her witnesses made themselves unavailable but she,

in violation of the law, was forced to have the hearing without them being present. Woodruff-

White laughed and commented that Plaintiff can "appeal" to whomever she wants to.

139.     As Woodruff-White refused to sign a notice of intent to apply for a supervisory writ and

set the date of return, it was filed unsigned. The notice of appeal was signed but since Woodruff-

White denied Plaintiff's application to proceed without prepayment of costs, she was demanded a

payment in full to the eavesdroppers for the "legal services" to the malefactor that maimed

Plaintiff, plus all other costs such as for the transcript preparation and all other fees that were

"due."

140.     Plaintiff timely filed an application for a supervisory writ with the Louisiana Court of

Appeal, First Circuit. Among other issues that she requested be considered on the application for

supervisory writ was denial of Plaintiff's In Forma Pauperis that precluded her from having the

matter appealed. Plaintiff demonstrated the irreparable injury but First Circuit, fully supporting

unlawful actions of corrupt Louisiana "public servants," in violation of the law and the U.S. and

Louisiana Constitution hid all her filings that included a detailed brief and over 30 exhibits,

demonstrating that the violent crime has been committed and then was covered up from public

access and public scrutiny.

141.    The time was going by but the First Circuit continued keeping the hidden case in a

"pending" state indefinitely. In the meantime, Woodruff-White has been calling Plaintiff the

"accused" that is documented by the minutes that pertain to the case and threatened to arrest

Plaintiff for not paying the abovementioned fees and dismiss the appeal "due to abandonment."

142.    After waiting for 16 months to no avail, Plaintiff dedicated a significant amount of time

and drafted a detailed, substantiated by attached evidence application for a supervisory writ to the

Louisiana Supreme Court. As a result, the First Circuit threw a bone to Plaintiff by reversing

Woodruff-White's denial of In Forma Pauperis on March 16, 2020 and stating that it "abused (its)

discretion" but still continued to unlawfully keeping the matter away from the public's eyes.

143.    Shockingly, Woodruff-White and Con Poe 1 – the supervisor of the "domestic violence"

department and utterly despicable and corrupt individual – did not stop in their madness but on

April 1, 2020 wrote, or had Con Poe 2 to write, as always anonymously, the following "minutes":

"(Plaintiff) paid ZERO (sic). Owes $1291.92 in court costs and $2000.00 to Brenden Craig in

attorney's fees."

144.    As already stated in the complaint, shortly after the August 22, 2018 show of a "protective

order hearing," put on by Woodruff-White, Plaintiff reached out to Carey, the supervisor of both

Weber and Murphy, to request the proof of the purported medical appointments' audio-recordings'

"alteration," claimed by Weber when it was under oath, in Woodruff-White's court, answering Plaintiff's questions. Plaintiff learned Carey's name and contact information from Stokes. She said that in the event Plaintiff is unable to get in touch with Carey, it was okay to call her back. Plaintiff contacted Carey multiple times, using the contact information, provided by Stokes. After waiting for over 3 weeks and not receiving any kind of response to any of her correspondence, she called Stokes back and said that she is not getting any response. Stokes said the email address was probably wrong. Plaintiff read the email address that Stokes dictated to her and that she used to contact Carey. Stokes said that the email address was right and asked what was the nature of her attempt to contact Carey. Plaintiff explained that Weber, with authorization of its supervisors, falsified the investigation of the second-degree batteries, committed against Plaintiff and lied under oath. And now Plaintiff requests the documentary proof of those deceitful statements, made by Weber. Stokes said that she needs to hang up but will "call (Plaintiff) right back" immediately. Jane Doe still awaits to receive that call back from Stokes. Stokes that was in a rank of a lieutenant has been promoted to a captain. According to the media, defendant Murphy Paul, Jr. while announcing the promotions stated that the promoted has deep "understanding of BRPD values." Yes, indeed.

Stokes also is on the board of directors of The Capital Area Family Violence Intervention center, Inc., known as IRIS Domestic Violence Center whose criminal, reprehensible dealings are detailed in this complaint.

145.    After the original August 8, 2018 protective order hearing was continued, Plaintiff noticed for the first time that someone might be accessing her computer remotely and her email and other online accounts. The only individuals who would have an ability and interest to do so would be the "law enforcement" defendants whom Plaintiff, after finally acquiring a copy of the

investigative reports through Sarah Margaret Smith on August 8, 2018 access to which has been

unlawfully denied to her by utterly corrupt BRPD started denouncing after seeing that report and

after realizing what was going on and what those defendants clearly did not want anyone to ever

find out.

146.     On a whim, Plaintiff went on the FBI website and filled out a form "report cybercrime."

She explained in detail what she thought was happening. Plaintiff was certain that her report will

be disregarded and was not expecting to be contacted regarding it. In approximately a week after

she filled out the form, Jane Doe got a phone call from an individual who introduced herself as

"Agent Katie" of the Baton Rouge office of the FBI. "Agent Katie" said that she received her

form submission and wanted to come to her apartment and talk to her about it.

147.     At first Plaintiff rejected it saying that it sounds odd to her that her complaint generated

such a response that a busy FBI agent wants to personally come over and talk to her. Agent Katie

told Jane Doe to call her supervisor to confirm Agent Katie's identity as well as intent. Plaintiff

did not call any supervisors but thought about it and decided that talking to the FBI probably

won't make matters any worse and she does not have much to lose irregardless of what their

intent was and how, if any, they were assisting the Louisiana law enforcement defendants, named

in this complaint and/or their unnamed/unknown co-conspirators.

148.     "Agent Katie" arrived at the preappointed time with another agent. Plaintiff asked what

was her full name but she refused to give it saying that they "usually do not give (their) last

names." Plaintiff told them what happened and described in detail how BRPD falsified evidence,

has been continually lying to her, denying access to public records for 8 months and until she

stopped trying to get a copy as was able to acquire it on August 8, 2018 through Smith, how

LADOJ authorized the crime cover-up and attorney general of Louisiana ignored her when she let

it know that it employs a violent, likely seriously mentally challenged individual with a sadistic personality disorder and requested that the crime and crime cover-up of BRPD will be reviewed by the attorney general's office, how she contacted the DA office of the 19th JDC several times but was always similarly ignored. The agents said that they will take all evidence that Plaintiff wants them to have and will "speak with the US attorney" regarding what Jane Doe related to them. They were especially interested to get a copy of the bogus "investigative report." Plaintiff said she doesn't mind giving them the copy but thought that they can easily immediately obtain the same from BRPD, if wanted to. The agents told Jane Doe that she "will be surprised" how long it will take them to get that copy directly from BRPD, "longer than (Plaintiff)."

Jane Doe also told them that Poulicek aspires to become an FBI agent. Agent Katie appeared to be delighted to hear that.

149.    On August 27, 2018 Plaintiff met with Cranmer who presented itself to her as an "advocate for abuse victims" who has experience prosecuting domestic abuse cases in Baton Rouge City Court. Cranmer looked at Weber's "investigative report" and said "yes, they definitely did not do a good job." Plaintiff told Cranmer that it is not that they didn't do a good job, it was the official crime cover-up, that's why the report is full of misleading statements but Cranmer was skeptical. Cranmer insisted that Jane Doe shows it her disfigured ears and Plaintiff pulled her hair and showed the injuries to which Cranmer commented: "It is so swollen. I can even see it right here." Then it found Poulicek's facebook profile and looked at its photograph, commenting, "There are just people like this, sociopaths, that do horrible things." Cranmer said that "Hillar can make them (BRPD)" to charge Poulicek and that Cranmer will be willing to write a letter to Hillar Moore provided that Plaintiff pays a $2500.00 retainer. Jane Doe asked since the only service it is willing to provide is writing a letter, can the retainer be lower. Cranmer said "no" but told Jane

Doe that if she is able to come up with the money, it will take her case. Cranmer, still not

believing that it was the official crime cover-up said that it will "make some calls," and will call

Chugg and "maybe someone else."

150.        After speaking with Chugg and possibly with other defendants or their unnamed co-

conspirators, Cranmer learnt that what was going on was indeed the official crime cover-up. It

then called Plaintiff to tell that "unfortunately (it) will not be able to take (her) case." As Plaintiff

picked up the phone, Cranmer hung up as was trying to cowardly leave a message. It later called

again but Jane Doe again answered the phone and Cranmer hung up. Later, Cranmer managed to

leave a message when Plaintiff was unable to answer the phone and the call went to the voicemail.

The interaction with Cranmer is described in this complaint because at a later time Cranmer

represented individuals against Plaintiff in a matter, intertwined with the events, described in this

complaint. That reckless disregard of the Plaintiff's feelings and rights and intentional infliction

of emotional distress in a criminal conspiracy and in violation of professional ethics was a direct

result of the personal meeting with Jane Doe which led Cranmer to talk to other defendants and

learn about the official crime cover-up. Interestingly, should Cranmer had just a tad of integrity,

its conspiring with other defendants and law enforcement criminals would go unnoticed and that

piece of the puzzle would not land where it did clear-cut.

151.        On November 19, 2018 Plaintiff met with another "anti-corruption activist," "Tom"

Aswell whose blog Plaintiff accidently discovered on the web. It appeared as Aswell was writing

about local government, sometimes making some assumptions and even accusations as well as

gently teasing certain characters. For example, it seemed to be obsessed with Landry, extensively

reflecting on its pre-attorney general "legal career" and telling funny stories about its impotence

in the courtroom and inability to handle even a simple case. To an unexperienced eye it seemed

what it was made to come across as: some independent, observant concerned senior citizen freely and honestly writes about local public officials, reflecting on its questionable and corrupt dealings. Soon Plaintiff learned firsthand that Louisiana public officials do not tolerate truthful and truly incriminating information about them as they have been censoring Plaintiff by immediately removing her texts that describe experiences, detailed in this complaint from the internet, intimidating and harming her, getting into her personal computer, making her blog unsearchable to the general public, deactivating her social media and email accounts, especially those used to contact true investigative journalists, not nakamotos and aswells.

152.    Responding to Jane Doe's email, Aswell wrote: "The attorney general's office is inept, inefficient and in some cases, outright corrupt, beginning at the top and working downward, so your plight doesn't come as a surprise to me. I have been taking critical shots at Jeff Landry for two years now. Could we meet someplace public to discuss your situation?"

153.    When Jane Doe personally met Aswell, it immediately did not feel right. It was obvious that the purpose it was meeting Plaintiff was not what it presented to her. Aswell was exhibiting that evil excitement from duping Plaintiff that she saw in Murphy – in fact, nearly identical. Aswell took the copy of Weber's report and later wrote to Plaintiff that it read everything but did not see Poulicek's name anywhere and asked what was the name of that individual who hurt Plaintiff. As Poulicek's name is repeated in the "investigative reports" numerous times, Aswell's question did not make any sense. Plaintiff suspected it before but after receiving that email, it seemed likely that Aswell's "purpose" for meeting Jane Doe, in addition to having a few laughs was to collect the report and then be used by defendants-co-conspirators in any possible legal action as a "witness" that would claim that a new, once again fabricated "investigative report," rewritten after Plaintiff pointed out most inconsistencies by analyzing it and submitting over 30

exhibits along with her other filings to the Louisiana Court of Appeal, First Circuit was the report

that Plaintiff gave it during the personal meeting.

154.    Notably, when at a later time criminals under the guise of Louisiana law enforcement were

intimidating and physically harming Plaintiff and she contacted Aswell who presents itself to the

public as such a concerned citizen who would never tolerate even some insignificant civil rights

or other rights and laws violation and would immediately speak about it to create public

awareness, and who personally told Plaintiff that she may call it any time, ignored Plaintiff's

attempts to contact it. It is likely that Aswell dupes the public by presenting itself as an anti-

corruption activist and people's rights advocate but in reality, just like Nakamoto, represents just

the opposite – and as far from its phony façade as it could be – works for those public officials

that it appears to be teasing and criticizing on the internet, to gather trust of the public and create

politically advantageous interest and controversy for those it works for. There is no way of telling

how many people got hurt and duped by Aswell as well as Nakamoto due to those phony

personifications they push on to the public through the media.

155.    In November, 2018 Plaintiff wrote a letter to the DA of the 19th JDC, detailing the crime

cover-up, evidence fabrication and falsification, Weber's lying under oath and repeatedly

perjuring itself, and other despicable dealings, done in order to shield Poulicek, a low-ranking

member of "law enforcement" from any criminal and civil liability. Jane Doe demanded that the

DA's office investigates the matter and brings Poulicek to justice. This time it was sent with the

tracking number and a signature confirmation. In about 2 weeks after it was received by the DA,

Fields contacted Plaintiff over the phone and told her that she wants to "chat" with Plaintiff.

Exhausted by continuous lies of corrupt fraudulent individuals in charge of "justice," Plaintiff said

that she is not interested in "chatting" and that her letter contains a detailed description of all the

events, willingness to provide evidence, and a demand that Fields performs the duties she was hired to do. In response, Fields continued lying to Jane Doe and gaslighting her. Among other things, she stated that she does "not doubt for a second" that Plaintiff was a true "victim" but since "conviction is not going to happen," she "recommends therapy." Fields also stated that she looked at BRPD's report and "they did a good job" – such an outrageous prevarication and insult to Plaintiff's intelligence clearly demonstrated who Fields really is and that she and the entire DA office has been in full conspiracy with other law enforcement defendants.

156.    On December 4, 2018, in a day after the phone conversation with Fields after thinking more about her lies and disgusting tactics, delivered in concert with other criminals under the guise of law enforcement where she subtly attempted to manipulate Plaintiff and her feelings about being the victim of the violent crime, wrote an email to Fields telling her that if she, after seeing the evidence of the crime and crime cover-up, will "join the criminals that run Baton Rouge Police Department and Louisiana Department of Justice" and refuse to perform her duties and prosecute Poulicek, Jane Doe "will publish all the details of the crime cover-up" including Fields' and Moore's involvement in it.

157.    Fields did not respond but her secretary started calling and emailing Plaintiff and telling her that she must see "Mr. Hillar Moore." Plaintiff asked what would be the nature of that meeting and if criminal charges were filed against Poulicek. No response was received that confirmed what Jane Doe already knew: fraudulent liars wanted to abuse her some more by trying to brainwash her, convince her that she "was wrong," and lie-lie-lie hoping that Plaintiff will accept their lies.

158.    On the next day Plaintiff realized that her social media accounts where she shared her story of being the crime victim who was violated and further mistreated by corrupt BRPD, DA

office of the 19th JDC, and LADOJ and other co-conspirators that have been assisting them in the official crime cover-up were deactivated. In her blog, all information that pertained to the criminal conduct of BRPD was removed but short sections, detailing her interactions with the DA and LADOJ were left. At the time, there was no much to tell about it except that she repeatedly contacted the DA and LADOJ and they ignored her or attempted to make a fool out of her. Although Plaintiff was terrified of such a criminal violation of her privacy, criminal interferences with her intellectual property, criminal unconstitutional absolute censorship that many people have no idea is omnipresent in the USA, she was not willing to give up.

159.    In the next few days Jane Doe attempted to contact dozens of investigative journalists, known on a national level some of which, Plaintiff thought, might be more or less genuine and dedicated to the freedom of the press constitutional principle. For the purpose of contacting them, she created a separate protonmail account. Criminals under the guise of "law enforcement" momentarily took control of it, enabled password reset, changed the password, enabled daily notifications of all emails to their email address. At any given time starting approximately August 2018 and through the present date, BRPD and other "law enforcement" criminals who have been assisting it in the crime cover-up have been fully controlling, accessing, spying on, deactivating, and modifying Plaintiff's email accounts and all her other online and offline PC activities.

160.    Plaintiff was overwhelmed, scared, somewhat in disbelief because of the dealings of those criminals under the guise of "law enforcement," made defendants in this complaint. With understanding that the crime cover-up was not any kind of a "high profile" case and still erroneously thinking that at least some of those "law enforcement" defendants and their co-conspirators must have some minimal amounts of decency and the line that they would not cross, tried not to panic.

161.    Within the next few days after Plaintiff made the statement to Fields, via email on

December 4, 2018 that she will make public everything what defendants and their co-conspirators

did and have been doing, those defendants physically attacked and battered Jane Doe, trying to

intimidate her, show her "who is in charge," make her to reconsider her willingness to speak about

outrageously corrupt, fraudulent Louisiana public officials and law enforcement, and, of course,

out of hatred: clearly all those defendants were/are of opinion that "no Jane Doe" would come and

be allowed to speak freely if it goes against their conspiracy, dirty dealings, and crimes.

162.    On December 11, 2018 Plaintiff had a tragic encounter in the medical office where she has

been viciously attacked under the guise of the "medical service" where some caustic, corrosive

substance was injected in her eyelids. The injection caused immediate chemical burns, skin

deterioration, eyelid deformities, and loss of the normal eyelid structures.

163.    The attack was carried out by Small, an ophthalmologist whom Plaintiff went to see due to

two tiny chalazions that were a result of an eye cream, getting into Jane Doe's right eye and

blocking the oil gland. The lower right eyelid chalazion was under 1 mm and was absolutely

undetectable visually and the upper right eyelid chalazion was around 2 mm in diameter and was

virtually undetectable by the naked eye. There was no inflammation and no intervention of any

kind was needed. Plaintiff wanted to quickly drain them as she understood that to be a safe 30-

second in-office procedure.

164.    Small told her that she needed an "injection of Kenalog." Plaintiff had never received any

injections, let alone steroid injections in the past. She asked what was the mechanism of its

purported effect. Small mumbled some nonsense in response. Plaintiff responded that she does not

think that it would work or that she needed it and asked if it could be quickly drained. Small said

that Jane Doe should get an injection as it was a "safer procedure" and then, "if it does not work,"

come back and get it drained. With understanding based on common sense, some knowledge of biology, some understanding of how human body works and specifically how her body works, Plaintiff said that she does not think it would work and does not want to get injected with anything. Small continued working on Plaintiff by using psychological manipulation and told Plaintiff that there were no risks, associated with the injection and it will help and is completely safe contrary to the drainage procedure Jane Doe came to have.

165.    With hesitation, Plaintiff decided to try it since some "board-certified ophthalmologist" who purportedly does those procedures on a daily basis swears that it was appropriate and safe. Small that never washed its hands before nor wore any gloves while touching Plaintiff's eyelids, slipped out of the room and quickly came back with papers she told Plaintiff to sign and with an already filled syringe. Plaintiff could not see what, when, and by whom was put into that syringe. Small, still with unwashed and ungloved hands, smothered some denatured alcohol over Jane Doe's eyelids and then injected some toxic caustic substance into the eyelids of the Plaintiff's right eye.

166.    Immediately after the caustic substance was injected, Jane Doe felt strong sharp pain and cried out in pain. Small touched her eyelids with its filthy hands saying that it was "spreading the medicine." Plaintiff looked at the mirror and saw horrible various deformities on her lower eyelid whose healthy and beautiful structures have been permanently lost. The lower eyelid was extremely swollen and was bleeding and the upper eyelid was also swollen and purple due to a large hematoma.

167.    As a result of the vicious attack, carried out by Small, Plaintiff's severely traumatized eyelid tissues got covered with various growths, scar tissues, and granulomas that appear exclusively in response to severe ocular assault. Chemically burned tissues are raw and swollen to

date. The eyelid folds melted away, healthy eyelid structures have been forever lost, the eyelids have various deformities and are inverted, causing eyelashes to rub against the eyeball.

168.     Just a few seconds prior to the vicious aggravated battery by Small, Plaintiff looked at herself at the mirror, specifically at her eyes that at the time were not yet damaged by anyone in any way and were flawless and beautiful. She did not know yet that it was the last time she saw her eyes in that way – symmetrical, healthy, and beautiful.

169.     When Jane Doe got home, severely injured, she remembers asking herself why she could not walk away and allow those "law enforcement" bastards to get away with their crimes without saying anything or trying to hold them accountable as she "could at least cover her ears with hair and try to forget about it" but "what will (she) do with (her) deformed eye?"

170.     Shortly, Jane Doe observed that her beloved dog started bleeding from his leg as if skin would suddenly get ruptured and lots of blood would get sprinkled everywhere. The dog was healthy, was not injured in any way to the Plaintiff's knowledge, and was closely supervised at all times. As Plaintiff worked from home, the only time she left the dog unsupervised was when she kept the appointment with Small from which she herself came back injured. After both Jane Doe and her dog got injured, Plaintiff was terrified of leaving him and suffered tremendously and panicked every time she had to leave him and tried to avoid leaving him whenever possible. Upon close inspection of the dog's leg there were no obvious signs of injury but in about a week what looked like healthy skin suddenly ruptured again and spilled blood all over the floor. Plaintiff took her dog to several veterinarians and explained that everything was fine but then, she thinks, someone hurt the dog by possibly injecting something toxic under his skin and it started rupturing suddenly while he just stands still. Plaintiff said that she thinks that if that's what happened, there might be a tumor forming just like the lab rats, injected with carcinogenic toxins, develop tumors

in a remarkably fast fashion. Some veterinarians did not say much or said they do not know what it was. One veterinarian said that it could not be a tumor and that Plaintiff did not go to a "vet school for many years" to possibly know. Plaintiff insisted that they run some tests and after they did, the veterinarian, with a concern and disbelief on its face walked into the exam room, carrying some kind of encyclopedia, wanting to show Jane Doe what kind of cancerous cells were observed under the microscope. The affected area on the dog's leg with as much skin as possible was immediately surgically incised.

171.    After being unable to sleep, in pain, having difficulty to open the battered eye as the eyeball was being prevented from rolling smoothly by the wounds and excessive swelling and experiencing problems with her vision, Plaintiff went back to the clinic on December 13, 2018 and requested that whatever was injected in her will be removed. Plaintiff was told that it was "Kenalog" that was injected in her eyelids, and it could be surgically removed. Jane Doe was told that Small was "not in" but that she will be seen by Holloway, a "clinic owner." That despicable individual attempted to grab Plaintiff's already severely traumatized eyelid but Plaintiff instinctively moved away. It refused to check her vision that was affected by the injection, refused to check eye pressure that in response to ocular battery might get elevated to the point that vision will be permanently lost, and refused to remove the toxic substance. Instead, it got up and, about to exit the room, said that Jane Doe will be escorted out by a nurse. Plaintiff said that she was seriously injured in Holloway's clinic and will not leave until gets some help. Holloway said that Baton Rouge Police Department will come and throw her out.

172.    Plaintiff decided to seek help elsewhere hoping to at least alleviate the symptoms and aftermath of the vicious ocular attack. She contacted Dr. Hetlzer's office through the patient portal for a referral thinking that Dr. Hetzler has at least higher ethical standards and will not send her to

another cruel sadistic butcher who will make everything even worse and because Dr. Hetzler

stated in the past that she could not just refer Plaintiff but even personally call and speak with the

doctor. That was stated regarding the ear plastics but since removing something from under the

eyelid also falls into the facial plastics realm which Dr. Hetzler specializes in and most certainly

knew someone as she herself said that she "know(s) surgeons all over." Dr. Hetzler's office

ignored Jane Doe's referral request just as it ignored all previous appointment requests and other

communication.

173.       Plaintiff then contacted a large ophthalmologic clinic and was scheduled to see Nelson.

Seeing how badly Plaintiff was injured by the injection, outrageously fraudulent, rotten to the core

Nelson refused to even diagnose Plaintiff and instead wrote that Plaintiff had a "red eye." It

"referred" Plaintiff to someone else in its clinic. The wait time for each appointment was

approximately 3 weeks. A couple of days prior to the appointment someone called from the clinic

saying that they "need to reschedule." When another appointment that was scheduled with Nelson

prior to its referral was approaching, same thing happened again and just a couple of days prior to

the appointment a call was received with the message that Plaintiff's appointment was canceled

because her "insurance would not cover" the visit. Plaintiff called the insurance and found out that

it was not true and that it was yet another Nelson's lie. Later Plaintiff learned that in the clinic's

system it was fraudulently "documented" that Jane Doe "was 4 times no-show." Nelson, seeing

the Plaintiff's injuries that scream: "vicious attack," "aggravated battery by caustic injection,"

"intentionally inflicted deformities due to the injected corrosive substance" did not want to do

anything with it and failed to even diagnose Plaintiff, fraudulently pretending that it does not see

it. Undoubtedly, even the most notorious charlatan will be able to recognize and see such dramatic

traumas. Nelson's "not seeing anything" went along with the conspiracy, cover-up of the hate

attack by the corrosive substance, and all other criminal secrecy that surrounds the events, detailed in this complaint.

174.    Plaintiff went to see Smith from "Williamson Eye Center." Since in addition to destroying the structures of Jane Doe's eyelids, causing various deformities, and chemically burning her tissues Small also infected Plaintiff with something that further damaged Plaintiff's eyelids as well as other facial tissues, Smith prescribed strong antibiotics and referred her to Booth, "an eyelid specialist."

175.    Booth told Plaintiff that she has multiple granulomas – wounds that get formed in response to severe ocular assault – and a large scar tissue that formed due to chemical burns, inflicted by Small. Booth agreed to surgically remove those wounds and growths.

176.    Plaintiff said that she wants all those wounds, growths, and other removed contents to be sent to a third-party lab for an analysis. Booth said that it would not authorize it but Plaintiff insisted. Some kind of uncertainty was created by Booth and its assistants with them walking in and then leaving a room "to found out" every time Jane Doe would bring up the subject. Booth injected Plaintiff with anesthetic and then announced that "the instruments were not ready." Came back in 15 minutes after the anesthetic nearly wore off, said that the contents will not be sent to the lab, made Plaintiff to sign the form that she "agrees" that the removed contents will not be sent to the lab, and started operating. While cutting out the wounds that were covering Plaintiff's eyelid that were formed in response to the vicious ocular battery by Small, Booth announced that it could see on the inverted eyelid even more granulomas than it initially thought there were and said that it will remove them all. The surgically removed wounds, growths, and contents consisted of a 9 mm scar tissue, several granulomas, and a tiny 1 mm chalazion under the guise of "treating" which Small attacked and battered Plaintiff by the injection. Not surprisingly, Booth

created a fraudulent, misleading, incomplete, and inaccurate "medical record" to cover up the ocular battery by the injection. While operating on Jane Doe, Booth removed a portion of her eyelid by unnecessarily cutting out the skin of Plaintiff's eyelid. Done either intentionally or out of quackery, it further disfigured Plaintiff's eyelid and created various problems in addition to those Plaintiff has already been suffering due to the sadistic, vicious attack by the caustic injection. Booth later operated on the upper Plaintiff's eyelid and failed to completely remove the contents that were formed in response to the vicious ocular battery by Small.

177.     As Plaintiff's chopped up, disfigured, raw, and covered in wounds and scars eyelids looked terrible with her eyelashes scratching and abrading her eyeball, she decided to try and consult someone else. As there was a very limited choice with most providers telling her they were "booked 6 months in advance" or unavailable to see her, Plaintiff went to see Williamson in the same "Williamson Eye Center." Williamson referred Plaintiff to Booth and when she declined, referred her to his other friend and created a fraudulent, deceitful "medical record," covering up the ocular battery by Small and then Booth's manipulations. When Plaintiff requested a referral to a doctor outside of the fraudulent circle who was incomparably better qualified and was willing to see Plaintiff, Williamson refused to write it and his assistant kept saying that Plaintiff "must see" Williamson's friend. Booth and Williamson would not release the records they created to Plaintiff after being repeatedly served with the authorization form for months and only released it after the complaint with the board was filed. Even then it required multiple phone calls to the manager of the clinic.

178.     Running out of options, Plaintiff decided to see Nelson to request a referral. Already knowing that Nelson is useless and dishonest, Plaintiff thought that maybe it at least would provide a referral. As utterly fraudulent Nelson refused to diagnose Plaintiff with any of those

horrible post-traumatic conditions that were the result of the attack by the caustic injection, its "referral" was rejected. When Plaintiff asked Nelson's assistant why there was no diagnosis let alone truthful diagnosis, she said that Nelson would "never write anything that would damage another physician's career."

179.    Filthy, disgusting Small infected Plaintiff with something that no quack was willing or able to diagnose her but just continued prescribing inadequate "antibiotics" and recommend inadequate and risky "diagnostic" procedures. As an exceptionally healthy individual – prior to the attack by Small in conspiracy with defendants and their unnamed co-conspirators – Plaintiff did not have to visit any medical offices or need any charlatanic "care" at all. Nearly all "doctor" visits in Plaintiff's life were due to some kind of attack/battery as described in this complaint or entirely elective, unnecessary rare visits just like the one she made a tragic mistake to have when got a 1mm oil gland blockage that did not require any treatment and would have resolved on its own but ended up with eyelid deformities, scars, wounds, loss of healthy, symmetrical eyelid structures, horrific unknown infections/viruses when she was attacked under the guise of providing "medical services." Plaintiff never had any kind of infections nor had taken any antibiotics prior to the attack/ocular battery, described herein. Plaintiff would never even touch her eyes after touching any door knobs, especially in a public place let alone some filthy, poorly maintained, outdated "medical office" such as the one where Small worked and where Plaintiff was attacked.  It is unclear how filthy the hands of filthy Small were and how long ago it washed them, but what Plaintiff observed personally, it was opening and closing the doors repeatedly and not even once washed its hands or put on gloves prior to touching Plaintiff. After Small inflicted the injuries and Jane Doe's eyelid started to bleed, it still continued touching it with its disgusting bare hands. Whichever disgusting Small infected Plaintiff with, damaged her eyelid skin in

addition to the damage that has been already inflicted by the injection of the corrosive substance, pulverized her cheek, mouth, disfigured her face on many occasions due to significant enlargement of the facial lymph nodes. Jane Doe did not even know prior to the attack by Small where her lymph nodes were and that they can be so large so the shape of the face changes and a round/oval face becomes rectangular or square. Plaintiff had to go to the ER twice and then stopped going although continued suffering from the aftermath of the attack by despicable Small since she realized that they were not going to help her in that "ER." Plaintiff, who hates "medical offices" which she normally does not need to visit, had a total of well over a dozen of various visits, exclusively on account of the attack by Small and other defendants-co-conspirators due to severe pain, severe unidentified infections, traumas, raw, unhealing wounds, deformities, and growths on her eyelids. The deformities due to chemically destroyed skin, adipose tissues, and other parts of the eyelids are permanent and present to date.

180.    Jane Doe found Small on the internet as she never visited an ophthalmologist in her 10 years living in Louisiana as well as rarely visited any medical offices prior to the vicious attack by Small. Not knowing any clinics or ophthalmologists, Plaintiff found the closest one and made an appointment. Just like in any conspiracy case where secrecy is involved, it is unclear how Small is connected to dirty law enforcement, made defendants in this complaint. What Plaintiff learned and observed - the "community," sued in the instant legal action is like a huge dysfunctional family where everyone knows everyone and mutually cover up its dirty dealings. When Plaintiff wanted to leave a review about Small and warn other potential patients/victims that that "medical provider" is dangerous, cruel, possibly sadistic, void of all ethics, capable of horrible things, and somehow connected to truly dangerous people, she saw some reviews about Small where the reviewers wrote about it being promiscuous, flirting with married men, and giving its phone

number to attached males . It is likely that Small is connected to one or more defendants-co-conspirators in that way.

181.     Whoever enlisted Small for the cause – to attack Plaintiff with the caustic substance so that she will see just who is in charge and that those "who" will not allow her to think that she has any rights or will be able to secure any civil rights and have a freedom of expression in "their" city, parish, state, and country – assured Small that it will not be in any way touched or affected by any possible consequences as there would be no consequences: defendants wholly control civil and criminal courts/dealings as well as fraudulent and inept organizations such as The Louisiana State Board of Medical Examiners and all other organizations/formations that has a power to hold Small accountable but never would.

182.     When Plaintiff commenced a battery and fraud action in the state court of competent jurisdiction against Small, Holloway, Nelson, Booth, and Williamson, it was unlawfully suppressed and hidden by Morvant and other defendants and/or co-conspirators. After waiting for around 6 weeks to see any activity in her case and seeing all her filings as a blank page on the clerk's website whereas all filings should be visible and available to public scrutiny, Plaintiff petitioned the Supreme Court of Louisiana, arguing that she was denied access to courts in violation of the Louisiana Constitution and that Morvant who demonstrated such unequivocal partiality and prejudice towards Plaintiff, violated the Louisiana Code of Judicial Conduct. The letter, notifying Morvant and clerk of court of the 19th JD was mailed by the Supreme Court staff on January 24, 2020 which was Friday. On Monday, January 27, 2020 the clerk and Morvant received the letter and "ruled" on the Plaintiff's filings, fraudulently backdating it to 6 weeks ago.

183.     Booth and Williamson were personally served with the action on January 27, 2020 but failed to file an answer. On February 20, 2020 Jane Doe filed a motion for preliminary default

which was rejected because "dates of personal service" were needed. Plaintiff made a correction and resubmitted the motion upon receiving a notification of rejection. The resubmitted motion for preliminary default was removed from the record as if left there would show the court's and the clerk's fraud, machinations, and extreme partiality, if someone wanted to take a careful look. However, it was "ruled" on July 8, 2020 – in approximately 5 months after was filed – by the way of a fraudulent minute entry that it is denied because Booth and Williamson purportedly made an appearance on "2/18/2020." The record clearly shows that Booth and Williamson did not file anything until May 5, 2020 – for over 3 months after they were served.

184. The action was fraudulently and in violation of the law dismissed under the guise of a "premature medical malpractice" action although there was no such cause of action in the complaint and the defendants were sued for battery and fraud.

185. Going back to December 4, 2018 when Plaintiff stated that she will expose the criminal actions of "law enforcement." As stated, "law enforcement" defendants-co-conspirators have been accessing, spying on, controlling various Plaintiff's accounts, electronic mail, and regular mail. During the first several weeks starting December 4, they were especially belligerent, obdurately and barbarically removing, blocking, deactivating everything they wanted. Around the same time, Plaintiff realized that she was unable to work as someone would disable the internet just before Plaintiff's contract hours during which she had to be online, block her devices whereas the message "your device has been blocked at the router access" would appear preventing her from accessing the network. Plaintiff's employment contract was nearly terminated due to someone cutting off the internet, changing the network access passwords, or blocking her devices right before her work was about to start. Even though it was her router, she was unable to reset it because someone disabled that feature. When Plaintiff got another router to connect and use

separately it worked for a while and then something was done to it and it stopped working. A friend who had over a decade of IT administration experience and who helped to set up that more secure separate router did not know what it was and was unable to fix it. Calling Cox was not helpful. Plaintiff's contract disallowed the usage of any mobile networks and it was stated that the system Jane Doe was using for work scans for it automatically and the violation would result in automatic contract termination. Getting a separate Cox account was not possible according to Cox and there were no other providers of a high-speed internet, servicing that particular area Plaintiff lived in. Jane Doe was warned that if there is one more internet failure event, she will be fired, and since there was every time something new invented to interfere with her work and whoever was doing it was always ahead of her, out of fear to get her working contract terminated, Plaintiff stayed at the friend's house nearly all January and February. Every time she was trying to go back to the place for which she was paying rent, something would be done to prevent her from working. As Plaintiff definitively knew that BRPD and other "law enforcement," referenced in this complaint were fully controlling her online activities, removing things she was publishing about her interactions with them in her blog, deactivating her accounts, changing her passwords, attacked and injured her and her dog as an intimidation tactic, to show her what they are capable of and to remind her who was going to make all the decisions about what would be made public and what will not, Jane Doe reasonably assumed that those same defendants were also preventing her from working to further show her "who is in charge" and out of hatred towards her.

186.     There was no reason to think on anyone else – Plaintiff had 3 male roommates that were exaggeratedly polite and sweet and acted as if they liked her and her dogs. The roommates were rarely home and seemed to be completely preoccupied with their own lives. At the same time, Plaintiff was being persecuted by dirty law enforcement that had unlimited access to local internet

services/providers and, apparently, were very invested in preventing Plaintiff to speak to anyone or expose them for what they have done. With all those things – injuries to her and her dog, a full control of her online activity where she could not do anything to stop them from removing information, deactivating accounts, etc., and now her inability to work or live peacefully at the place she was renting – happening to her all at the same time immediately after she promised to tell everyone who wanted to listen what kind of law enforcement they are and what they have done – made Jane Doe think that BRPD, LADOJ, DA office and other defendants were responsible for all those things, not only for harsh, totalitarian-like censorship, privacy violations, and infliction of severe injuries under the guise of providing "medical services."

187.   Knowing that those law enforcement defendants have unlimited power and can even murder her and get away with it as no one would know and no one would investigate – that would fall into their "jurisdiction" and it is clear how they generally investigate and will "investigate" their own crime, if it got to that point, she decided to file a civil rights complaint in the federal court against those defendants, not really hoping that they would stop or that anything will get resolved in her favor but thinking that maybe it would create at least some public awareness and defendants would think really hard before murdering Plaintiff in some well-staged "accident;" after all, all they care about is their pensions, the money the stole or "reappropriated," and the positions of "power" they secured. Plaintiff decided to handwrite the complaint to minimize eavesdropping by defendants who have been accessing her all electronic devices. Plaintiff went to the courthouse on January 25, 2019 and her complaint was first read by someone for nearly an hour who then told Plaintiff that it should be filed under seal. As Jane Doe categorically protested and stated that she as the plaintiff did not request any secrecy, it was finally filed.  As the complaint was suppressed by the court and no summons were issued for over 6 weeks, Plaintiff,

knowing that in will be kept in a pending state indefinitely, discovering more facts as they came to light, being embarrassed for its poor quality with lots of errors and typos as if it was not possible to proofread a handwritten complaint which was written fast in fear of more retaliation, and feeling hatred towards herself from all those defendants decided to dismiss it as a matter of right and then refile it. To make it clear that she was planning on refiling it, Plaintiff filed a "Motion to Dismiss Without Prejudice." The court momentarily "granted" the motion, dismissing it with prejudice.

188.     Knowing that the law was violated and that all her claims were unlawfully barred including the request to appoint a private investigator/private prosecutor which some crime victims, including the victims of crimes, committed by law enforcement, have been granted, appealed the matter to The United States Appellate Court for the Fifth Circuit which reversed the judgement.

189.     Although defendants were never served with the first complaint, they immediately knew about it either before it was filed or shortly after. At the very least, since despicable "law enforcement" defendants have been monitoring and controlling Jane Doe's email accounts and as she opted for electronic notifications instead of the ones sent via the US Mail, the notification was sent immediately after it was filed. In less than an hour, Plaintiff received an email from Craig who was representing Poulicek in a tort action with the motion to "enroll counsel," attached to it. Craig immediately stopped representing Poulicek and all further communication went through another individual, not associated directly with the crime cover-up.

190.     Not only "law enforcement" defendants have been controlling and accessing Plaintiff's personal accounts such as emails but they also have been sharing access/passwords with the whole conspiracy group. If "law enforcement" eavesdroppers have been doing it in a more

sophisticated, ghost-like manner due to the technologies and access available to it as well as because of the access it gained by likely physically manipulating with the Plaintiff's devices, then others have been simply using the passwords, provided to them by those unlawful "law enforcement" eavesdroppers. For instance, once Plaintiff was looking at her emails and observed that the email she was looking at – the one sent by Craig in connection with litigation against Poulicek – disappeared as if was deleted by someone. Next second, an alert email from her electronic mail provider landed in the mailbox, advising that someone just accessed her account, using a "Tor" browser. It is impossible that someone could have known or guessed the password that Jane Doe created. It has been stolen by "law enforcement" defendants and then shared with other co-conspirators. Later the password was changed by the defendants to prevent Plaintiff from accessing it as that was the email, used to communicate with Weber, Murphy, Fields, and many others defendants-co-conspirators. It is truly disgusting to be violated in such a way – in that mailbox there were confidential documents, private correspondence, dated as far as a decade back, etc. – and it all were unlawfully accessed and then attempted to make it unavailable to Jane Doe – certainly, neither of those defendants-co-conspirators would want to be violated in that way or any other way. However, in comparison to other things they have done that are detailed in this complaint, this violation of privacy and tampering with personal things/accounts sound like a child's play.

191.    After Plaintiff made a statement to Fields on December 4, 2018 about exposing the "law enforcement" defendants-co-conspirators, those things she already described – constant, totalitarian-like censorship, violation of Plaintiff's privacy, injuries to her and her dog, preventing her from working whereas she nearly lost her employment – made Plaintiff uncertain about what might happen next. As defendants-co-conspirators were barbarically deleting information from

her blog, deactivating her accounts, and preventing her from contacting anyone who could possibly help or impartially look at what was happening, she felt helpless and sometimes frightened. Without any expectations and maintaining a skeptical approach based on what she already knew and observed, Plaintiff dialed the number of a Baton Rouge FBI office and, after being connected to some clown, explained to it that she has been persecuted by Baton Rouge Police Department that removes truthful incriminating things she publishes about it, describing her personal interactions with it, controls her online activities, prevents her from contacting genuine or likely genuine investigative media outlets, among other things. Jane Doe was asked all the details about who she was, what was her address, phone number, and it appeared that the clown was also typing all the information she was giving it. The call lasted for around 10 minutes and there was no doubt that the call taker understood her well and followed her line of thought. Suddenly, and what would appear illogically, the FBI clown blurted out: "For all further inquiries regarding this, contact Baton Rouge Police Department" and quickly hung up. Plaintiff dialed again and asked to speak with "Agent Katie." She was told that "Agent Katie" was not available and asked what was the reason of her contact and then told that "Agent Katie" will get her message.

192.     In a couple of days "Agent Katie" called and introduced herself, using her full name, probably automatically or on account of forgetting that she was not supposed to give Plaintiff her full name, as she stated in the past. Agent Katie asked when she can come by and return the copy of Weber's fabricated, manufactured "report" that Jane Doe gave her nearly 3 months ago, in September, 2018. Plaintiff asked why she wanted to return the copy of the report now. Agent Katie said because Plaintiff recently "called the office." Jane Doe said that when she called the local FBI office, she made the purpose of her call abundantly clear and it had nothing to do with

the report. Agent Katie was disinterested in talking about the true purpose of the Plaintiff's call but kept insisting that she wants to return the report. When Plaintiff gave the copy to the agent, she also explained that it was not her only copy. Nevertheless, Katie asked if Plaintiff wanted her to make a copy and bring it back – at that time it was unclear whether they had a copy machine with them in their van/vehicle or wanted to come back some other time and return it – and Plaintiff clearly stated once more that she has a copy and was not giving them her only copy. Who would give away the only copy of the report access to which has been unlawfully denied for a long time and then, by luck or some accident, finally has been acquired? Reasonably thinking that Agent Katie wanted to bring a re-written copy, once again re-manufactured by BRPD after Plaintiff pointed out most inconsistencies and provided some evidence of the report's inadequacy, she told her not to bring any reports as she has the copy of the original report that was brought to the courthouse by Weber and given to IRIS's legal director Smith in August 2018.

193.    As already stated, Plaintiff was unable to stay in January and February in the place that she was renting since somebody was disabling the internet, changing network passwords, and blocking her devices right before her contract hours. Slowly, towards the end of January – early February it started becoming apparent that two out of three roommates who shared the house with Plaintiff were responsible for those things. They also were disabling the cooling system when were not using it so that Plaintiff would not be able to use it, turning on the heater on maximum when she was sleeping and leaving the house knowing that Plaintiff strongly dislikes it, and disabling the water heater so that Plaintiff would not be able to use hot water when they were not home or were not using it themselves. There was a whole saga that involved a certified HVAC technician who was unable to reconnect the air-conditioner unit when the roommates were disabling it and Jane Doe heating the water to "shower" until she started noticing that the

roommates always take hot showers but soon after that water turns cold again. When Plaintiff

installed the third router, more secure and difficult to tamper with, the roommates disconnected

the wire and put a lock on the box of the house that housed those wires. After realizing that those

roommates were doing those things and she, although timely paid rent was unable to live in the

house and work from there in January and February, started withholding rent in March. Typically,

the owner would not get involved and would not ask for rent for weeks which the roommate,

responsible for sending payments to the owner repeatedly stated. Plaintiff also saw herself that the

check that she would give timely to the roommate would get deposited in the middle of the month

or even later – depending on the roommate's mood and availability. This time, the owner,

contacted by the roommates who actually wanted to evict Jane Doe, was prompt and served the

notice to vacate immediately. The eviction suit followed.

194.    After being served with an eviction summons, Plaintiff decided to contact Southeast

Louisiana Legal Services (SLLS), against her intuitive protest and already knowing that they

would not help her as it is also controlled, sponsored, and run by local government such as City of

Baton Rouge and East Baton Rouge Parish and not even being sure that she wanted or needed

their help, Jane Doe concluded that likely it would not or should not make matters worse.

Although SLLS claims that for urgent matters such as evictions it gets back to the requestor

within a day, it continued ignoring Plaintiff and brush her off with empty promises to call back for

about 5 business days until there was only a day left. Since Plaintiff kept calling, they finally, on

the very last day agreed to see her. An individual she met with introduced itself as "attorney

Gray." Gray said that it kept calling but Plaintiff was not responding which is an outrageous lie

and there were no missed calls or left messages and Jane Doe called every day herself. Gray said

that since it was unable to get in touch via telephone, it mailed a letter. No letters were received

either. Gray "interviewed" Plaintiff, told her that she does not have any defenses, that she should have paid rent even if was unable to work from the house, unable to have access to hot water and the cooling system and unable to resolve the situation after so many attempts (repeated visits of a certified HVAC technician who did not know how to reconnect the air-conditioner and would tell her to first get an electrician who can find a "point of access," repeated visits of Cox technicians, countless calls to Cox, 3 different installed routers, help of the friend who worked as an IT administrator for years). Gray also tried to convince Jane Doe that internet was not included in her contract (and anyone could disable it and prevent her from working legally) whereas Plaintiff kept telling her it was and she was charged for all services and utilities every month in addition to rent. Interestingly, the owner of the house and the roommates claimed the same but when the first unlawful eviction was denied, the owner made arrangements with Cox to allow her to get account under her name and stated that the amount for the services will be subtracted from rental payments as Plaintiff "will not be using a shared account anymore." Gray asked who was the judge, Plaintiff told it, and Gray responded: "She would not even listen to you. She'd just ask, 'Did you pay rent?' and that'd be all." Gray denied Plaintiff's representation but, against Plaintiff's protest, grabbed all Plaintiff's papers to copy them. Jane Doe said there were papers not even relevant to the eviction and stated she was uncomfortable with it copying it especially because it said they will not be representing Jane Doe. Gray said it will copy them nevertheless. Then, Gray gave some papers to Plaintiff to sign that she met with Gray and had a discussion. There was also a letter that Gray claimed it mailed to Plaintiff when was "unable to reach" her within those 5 business days Jane Doe repeatedly called them but was told to wait and when it will be her "turn" in queue, they "will call" Plaintiff themselves. After realizing that the bogus letter that was never mailed got between the documents it gave Plaintiff to read and sign and that

Plaintiff was looking at it, it rapidly grabbed the letter (that it claimed it mailed to Plaintiff a few days ago), saying "Not this one." Plaintiff believes that Gray reported to defendants or their unnamed co-conspirators that a phony interview was conducted and what was its "findings."

195.     At the eviction hearing, the owner was represented by Jeansonne who "practiced eviction law for nearly ten years," according to several of WAFB 9News 2019-2020 articles/news pieces, published on wafb.com where Jeansonne provided his "expert" tips, related to evictions in Louisiana. Jane Doe represented herself. The unlawful eviction was denied even though a "non-payment" of rent was claimed. The judge found the affirmative defenses to be strong enough to deny it. While denying the eviction, Judge Judy Moore Vendetto advised Plaintiff to leave that place as soon as possible as the owner did "not sound like the type (she) might want to continue with."

196.     At the time, Jeansonne was the only attorney in the area advertising itself as an "eviction attorney" and the only name that came up in the search for eviction attorney in Baton Rouge in 2018 and 2019. It appeared that the owner found Jeansonne on www.kickemoutquick.com and it was the only Louisiana lawyer, presented as a "member" on that website.

197.     After the unlawful eviction was denied, the two roommates immediately resorted to their "self-help eviction." The owner attempted to make Plaintiff to sign a lease termination and release all possible claims against it and all others involved and that in return it might provide a "relocation stipend." That did not work and the owner then demanded payment in full, ignoring the fact that Plaintiff physically could not stay in the house without fault or intent of her own in January and February however timely paid rent. When Plaintiff was signing the lease, the roommate who was practically in charge of everything told her to put any date, the earliest she thinks she will want to move out as it could be easily extended and she put the date that made her

lease length around 9 months. The owner reached out to her and said that the lease must be 12 months and that she will have to find a replacement if would want to move out in 9 months. However, he no longer wanted to keep the agreement and told her to move out immediately after that 9-month mark is reached. Plaintiff said that it was not what they agreed to and that she will pay him for the months of March and April on top of him already keeping her deposit that was more than one month rent although was unable to use the property for at least two months, in January and February for which she paid and the roommates were messing with her employment and utilities but he did nothing, provided that the lease length will be what he stated and what they mutually agreed to. The owner said no and filed for another eviction.

198.    When Plaintiff came to Baton Rouge City Court for the second eviction hearing, she realized that there was no other general public, just 2 women, sitting next to each other that looked like lawyers and appeared to be waiting for the hearing as well. The bailiff gave Plaintiff a dirty look and, without even asking her name that is always asked in that kind of situations, shoved the papers with her name on it at Plaintiff. As soon as Plaintiff took a seat, she noticed that a figure, exhibiting arrogance and concealed aggression, was moving towards her. It stopped probably 12 feet away and said: "Come here. I want to discuss your case." Plaintiff did not move but a few minutes later the hearing started and she realized that the arrogant figure, attempting to order her around was Cranmer whom she met a couple of months ago, who agreed to communicate with the DA on her behalf to ensure that criminal charges will be filed against Poulicek provided that Jane Doe pays the sum it quoted, but then, after talking to Chugg and likely "law enforcement" defendants and finding out that Plaintiff's ordeal was the official crime cover-up, joined it.

199.     The first eviction hearing when the unlawful eviction was denied, took place in a courtroom, full of ordinary citizens who came to settle their misdemeanors, traffic violations, and respond to filed evictions. It was clear that, while deciding her case, the judge was absolutely impartial and looked only at the facts and presented evidence. The second hearing that involved Cranmer, strongly appeared staged. Hester, who just became a judge but was a prosecutor and section chief of the Violent Crimes Unit when the "official investigation" and crime cover-up of Jane Doe's case took place presided over the case. Cranmer enjoyed its role with cheap tasteless and churlish dramatizations such as leaning against the witness stand when Jane Doe was in it and asking questions slowly, in a loud voice as it was reading a story to a child. It asked many questions such as: Did you sign the lease? Are these your initials? Did you sign the "addendum that says zero tolerance for criminal activity?" None of those questions were needed as whether Plaintiff signed the lease or not was not disputed and Jane Doe filed a detailed answer. Cranmer also knew very well that it was not Plaintiff who committed the crime but enjoyed making its untruthful innuendos.

200.     The reason why Plaintiff took so much of this complaint's space to describe those events, involving Cranmer is because it all related to the conspiracy, asserted in this complaint. Cranmer who seem to put lots of thought and labor in its online presentation, including promoting, marketing, and selling its "legal services" did not advertise in 2018 or even 2019 that it handles any eviction cases. In fact, according to all its "serious" profiles and presentations such as on the law firm website, avvo.com, americanlawsociety.com, lawyers.justia.com it still does not handle evictions. However, since it is not the first time Plaintiff makes allegations about it being deceptive and in conspiracy with other defendants, and it likely anticipated to be added as a

defendant in the instant lawsuit, it is now a "member" of kickemoutquick.com. That ruse has a purpose of defending against Plaintiff's allegations.

201.    The truth is, even though defendants-co-conspirators were never served with the first complaint, filed on January 25, 2019 that was suppressed and thrown out by the court, and then reversed by the 5th Circuit, they read it closely and continued monitoring Plaintiff and eavesdropping relentlessly. Since in the first complaint Plaintiff likely erroneously asserted that in addition to all the things done by defendants and known to Jane Doe at the time such as deactivating her accounts, changing passwords in emails accounts, preventing her from contacting anyone who could possibly intervene or assist in making her story public, barbarically censoring and removing her online publications, among many others, defendants were also directly responsible for preventing her from working as it all started happening nearly at the same time, right after she made a promise to Fields to expose the crime cover-up. As Plaintiff already reflected above, any reasonable mind would assume that all that was coming from the single source and there was virtually no reason to suspect her "friendly" and "sweet" roommates. There is no way that out of nearly 19,000.00 licensed attorneys in Louisiana, the owner of the house who lived in China found and picked Cranmer who was not advertising itself in any way as an eviction attorney nor was handling such cases. Why defendants-co-conspirators wanted a well-appraised co-conspirator to handle this? To keep their fingers on the pulse, to have a dedicated witness who would, if needed, discredit Plaintiff's allegations in the future as it handled the case itself, out of pure fun and making sure the case that time will be ruled against Plaintiff, because it is what they do and Jane Doe personally observed that the "jungle telegraph" works superbly in that dysfunctional, tightly knit community of "law enforcers" and all those who assist them.

202.    Not that the details, involving Cranmer are particularly important among all civil rights' violations and crimes, committed against Jane Doe but they, among other described events, demonstrate very well the ubiquitousness of conspiracy between defendants of the City of Baton Rouge, East Baton Rouge Parish, and the State of Louisiana. That's how they operate – the basis of all "legal proceedings" that involve police, DA, courts, all organizations controlled by the city, parish, or state such as LSBME, LADB, PCF, IRIS, SLLS, and many others are not based on an impartial and independent evaluation – in case there is something at stake or even a minimal involvement of any politically connected – everything is based on plotting, whispering in secrecy, perverting and concealing, and otherwise securing unjust advantage to "politically connected" at expense and harm of those who opposes them.

203.    After the first complaint against defendants that Plaintiff was unable to prosecute was filed, defendants momentarily knew about it although had not been served with it "officially," made some changes in the way they persecuted and controlled Plaintiff. Defendants stopped barbarically deactivate her accounts or remove text from her blog. Instead, they made it invisible to the general public and even if its exact unique name is typed into the browser or search field, it would not bring any results. Of course, it would not come up in the search as well even if unique phrases or the combinations of its unique phrases are searched for. Having experience with the website building and maintaining in the past and knowing that what was going on is impossible unless someone with access and ability to steal and manipulate electronic information would put a dedicated effort into it. Plaintiff also contacted the website's technical support several times but they would tell her that everything worked fine on their end and as far as they were concerned, she should not have such issues or restrictions.

204.     On April 20, 2020 Plaintiff received a laptop, purchased at amazon.com. The box was

unsealed and the contents such as plastic wrappers were tampered with. The product was

purchased as "new." The laptop itself was most certainly tampered with. Plaintiff immediately

packed it and sent it back. On April 22, 2020 Plaintiff attempted to purchase a laptop in Costco

Warehouse in Baton Rouge. She talked to the electronics department consultant who told her

about the model she was interested in and that she can take a picture of the model number, show it

at the checkout, and they will bring one from the storage. When she requested it in about 40

minutes at the checkout, the store manager went to bring it, came back, and said they don't have it

and the only one left is on the display which they can sell to her with a discount. Plaintiff said that

she definitively knows that they have dozens of that new model laptops in stock and that she

knows why they doing it, and that she wants one in a sealed box. The manager said it is not

possible but they can get the one on the display ready for her in 20 minutes. Plaintiff asked why

would it take so long and was told that they need to "reboot" it. Plaintiff said that it takes a few

seconds to "reboot" a new computer with such performing characteristics that is in its full

operational capacity and whose memory was not filled with anything to slow it down. Jane Doe

said she tested the model unit and it looked absolutely knew and shiny as Costco just received the

model and just put it on the display and it was ready to go as far as its performance was

concerned. The manager and an assistant manager who joined him were telling Plaintiff that they

will have to "reboot for (her) safety" and it should be ready in 20 minutes. Tired of being abused

by corrupt "law enforcement criminals" and wondering if there are any phony warrants presented

or if all that "cooperation" of the stores and marketplaces is a "gesture of good will" and a "favor"

to "law enforcement," and if there are warrants, who signs them.

205.     In order to not interrupt the chronological order of the events, related to the crime cover-up and all Plaintiff's interactions with the police and other "law enforcement" defendants as well as the details of the vicious attack on Plaintiff and other things defendants-co-conspirators have done, some details, chiefly Jane Doe's interactions with Dr. Hetzler were not described above. Plaintiff saw Dr. Hetzler on November 30, 2017 and then once more on May 10, 2018. Everything what Dr. Hetzer did in the exam room, was perfect. The first thing she did was thoroughly washed her hands – such a contrast with filthy Small that did not wash its hands nor wore gloves although touched Plaintiff's eye's, pulled her eyelids, and even touched her again after it inflicted the injury and Jane Doe started bleeding from her eyelid. Other charlatans – Booth, Nelson, Holloway, and Williamson did not wash their hands and all except Holloway touched her eyes and eyelids, including on the inside of her eyelids, and Booth also operated on Jane Doe.

206.     Dr. Hetzler was incredibly compassionate but honest and if could not see some injuries, would say that she could not. For example – and the recordings of the appointments would clearly demonstrate it – she could not see one injury which was a large and incredibly painful fracture at the conchal bowl-antihelical fold junction, hidden between those two ear structures. Otherwise, Dr. Hetzler confirmed the majority of the injuries in strong, various, and repeated multiple times throughout the discussion statements, such as: "I see the difference in your ears. I absolutely do. And I see the difference from that (a photograph of the pre-injured ears) and I see what's been done to you, but there is no easy way to put it back together." "We don't need an MRI to see that he changed your ears or that he hurt you more than just physically." "Walk away from it with your scars and with your changes [...] despite this horrible person who did this to you."

207.     When Plaintiff finally saw the medical record, created by Dr. Hetzler it felt like a stab in the back however there is no comparison with utterly fraudulent and 100% dishonest "records"

created by Sharp, Booth, Small, Nelson, or Williamson. Plaintiff could see and feel the dilemma that Dr. Hetlzer likely was having, balancing out being at least partially honest and by doing that helping the victim and "not saying too much" and avoiding being sucked into criminal justice proceedings (that definitely should have taken place if "law enforcement" defendants-co-conspirators hadn't covered it up) and all other possible actions and proceedings.

208.      When on November 2018 Plaintiff mailed Dr. Hetlzer a CD with the recordings of the appointments and asked to confirm that certain statement regarding the observed injuries were made, she was soon discharged as a patient across all Our Lady of the Lake physicians group and it appears that Our Lady of the Lake got involved in whichever way it could to support corrupt public officials and law enforcement, made defendant in this complaint.

209.      At the deposition, taken on July 31, 2019, Dr. Hetzler provided a new version of her assessment of the Plaintiff's injuries that is distinctly different from the original one, made at the privacy of her exam room when she did not know or did not think that the conversation was being recorded and was honest and genuine 100%. The deposition version is also different from the official medical record that Dr. Hetzler created likely shortly after meeting Plaintiff when she carefully crafted a well thought out record where, it appears, wanted to document at least some of the injuries and then add some of not so strong and somewhat ambiguous comments regarding most serios fractures that could only be inflicted by a hand of a sadistic psychopath that broke the entire concha bowls, permanently deforming them and causing traumas that would take years to fully heal, but still carefully evaluating each word for the possibility of getting sucked into criminal proceeding or civil litigation. Jane Doe estimates that in creation of the official record Dr. Hetzler's honesty index was at approximately 15-20% which still seem to be an honorable

thing in the world of webers, nelsons, morvants, smalls, nakamotos, and many others where the

absolute fraud and deception are the norm of life.

210.    The third version of Dr. Hetzler's assessment and evaluation, given at the deposition, had a

purpose of in a way recalling the previously made statements, volunteering non-responsive

answers that were calculated, in conspiracy with defendants, harm and undermine the

exceptionally strong evaluation and assessment of the injuires, provided previously. Laura Hetzler

stated that she listened to the recordings more than once and her lawyer Cefalu, made an unsued

co-conspirator in this complaint, seemed to be very well familiar with the contents of the

appointments. Cefalu bombarded the deposition with the myriad of invalid, baseless objections,

disrupting the proceeding and distracting Plaintiff by its parrot-like frequent utterances. Cefalu

also, in violation of Civil Rule 30 and relevant Louisiana law blocked certain questions when its

client was so uncomfortable that would turn all the way to Cefalu and look at it instead of at Jane

Doe. For example, Plaintiff asked whether Dr. Hertzler dismissed her as a patient as she was never

able to get an appointment or even a referral and she also definitively knows that she was

"dismissed" all over the OLOL system after she mailed the CD with the recordings to Hetzler and

asked her to confirm hat she made certain statements. Dr. Hetzler continued insisting that Plaintiff

was still a patient of hers and would not say or would "not know" why she never was able to get

an appointment. Plaintiff asked whether she will be able to get an appointment if she calls

tomorrow and kept insisting that the deponent states yes or no without any maneuvering and

deliberately uncertain answers. After some of going back and forth, Dr. Hetzler said that Jane Doe

"could make an appointment" which is clearly an answer given to avoid a strong yes answer as

Plaintiff was long discharged from Dr. Hetzler's practice and the entire OLOL physicians group.

Certainly, a physician has a right to dismiss a patient and also must immediately advise a patient

by a letter. In this case, admitting that Jane Doe was dismissed would go against all the shenanigans in order to carefully assist defendants in the crime cover-up or at the very least not stand in their way.

211.     Not only Dr. Hetzler in a carefully thought out deceptive way recalled many oral statements, made regarding Plaintiff's injuries but also recalled what she personally wrote in that incomplete medical record she created shortly after seeing Plaintiff in her office.

212.     Ear injuries, caused by Poulicek left various permanent deformities on the Plaintiff's ears – there is virtually no place left that was not affected as it was like a game to the sick, sadistic psychopath and it would not stop until caused substantial damage. Plaintiff sustained loss of a helix of her left ear. Damaged tissues and skin felt like sand paper for the first 2,5 years, with unhealing wounds, constant skin peeling and shedding of debris, created by the healing process, an extreme ear redness and an extreme burning sensation where ears remained in the hypothermic state for the first 20 months and then for 6 more months to a lesser degree. The ears were hot to the touch and felt as if they were on fire causing Plaintiff to feel hot all the time. It was such a contrast to the pre-injured ears that were always pleasantly cool due to the properties of the healthy cartilage and also were entirely colorless contrary to their bright red post-injured state, caused by severe traumatic damage and inflammation.  For the first 20 months Jane Doe experienced strong pain and occasional extreme sporadic pain that was resonating into the scalp and the back of the neck. For the next 10 months the level of pain was subsiding. Plaintiff was avoiding touching the ears and wearing clothes that did not have a wide enough opening and could accidentally touch the ears. For example, trying to put on a turtleneck would be painful even now, 3 years ago or even 2 years ago would be out of question. For the first 20 months even

a T-shirt with not wide enough opening was problematic. Sleeping on the sides was out of question and still painful. Some parts of the ears felt numb for over 24 months.

Poulicek conducted its sick experiments on the Plaintiff's dogs as well and damaged cartilage of the ears of one Jane Doe's dog and a tail of another dog. That greatly contributed to Jane Doe's severe psychological and emotional injuries she sustained as a result of her ordeal, involving Poulicek.

213.    The eyelid injuries, inflicted on Jane Doe by the vicious attack in the medical office under the guise of "providing medical services" when filthy Small injected some caustic, toxic substance in the Plaintiff's eyelids and caused loss of the eyelid structures, permanent deformities, loss of the portion of the eyelid, skin damage, various traumatic injuries and growths to the eyelid, unhealing wounds where the portion of the eyelid akin to raw meat, moist wounds with peeling skin where all debris and by-products of the healing process are trapped in the wounds and can only be removed by the surgical pointed tweezers have been an unspeakable blow.

214.    Plaintiff's mother who only saw the injured eyelids through the web camera which does not normally provide a sharp enough image, immediately recognized Jane Doe's destroyed eyelids. Other persons who personally saw the eyelid traumas asked Plaintiff: "Who injured you like this?" The ones who knew about Plaintiff's ordeal with Louisiana law enforcement stated that they "believe" that it was done "in conspiracy" and "on purpose." The ones who did not have a filter in place, started calling Jane Doe's injured right eye "ugly eye."

215.    Since the attack in the "medical office" Jane Doe has been avoiding looking at herself at the mirror and would not look for weeks and even months at the time as looking would cause Plaintiff to break in tears and then feel distraught and mournful for days.

216.    Plaintiff incorporates each paragraph of her Complaint into each cause of action/

count herein:

### Count I - (42 U.S.C. § 1983 – Deprivation of Rights)

217. Acting under color of law, statute, ordinance, regulation, custom, and usage of the

State of Louisiana, East Baton Rouge Parish, and the City of Baton Rouge, defendants

and its named and unnamed co-conspirators subjected Jane Doe to the deprivation of

rights and privileges, secured by the Constitution and laws, namely rights of crime victims, rights

of access to courts, rights to free speech and press.

"Deprivation of Rights under the Color of Law - 18 U.S.C. Section 242 makes it a crime

for a person acting under color of any law to willfully deprive a person of a right or privilege

protected by the Constitution or laws of the United States, including acts done by federal, state, or

local officials within their lawful authority, as well as acts done beyond that authority, if they are

done while the official is purporting to or pretending to act in the performance of his or her

official duties," U.S. Department of Justice. What defendants have done and have been doing is a

crime and should have been prosecuted criminally. The complaint details countless instances of

the deprivation of rights by defendants and their named and unnamed co-conspirators.

### Count II - (42 U.S.C. § 1985 – Conspiracy to Interfere with Civil Rights)

218. As detailed in this complaint, every instance of deprivation of rights have been done in

conspiracy by defendants and their unnamed co-conspirators. Crime cover-up, physical attacks

and the infliction of the injuries, unlawful searches and seizures, eavesdropping, stealing of

information, continuous cybercrimes, abuse by those with "judicial powers" – all that has been done by defendants and others in conspiracy to deprive Jane Doe of rights and privileges.

### Count III - (State Law – Aggravated Battery)

219. The caustic injection attacks on Jane Doe is an aggravated battery which is a battery committed with a dangerous weapon. As defined by La. RS 14:2, "Dangerous weapon" includes any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." Defendants co-conspirators, namely Small, the vicious attacker; Booth who covered up and concealed various traumas, growths, and scars that were clear evidence of the vicious attack but were never documented properly nor sent to the independent lab for analysis against Jane Doe's will and her direct, repeated requests but were secretly and quietly disposed of by Booth; BRPD, DA office, and LADOJ defendants and their co-conspirators that ordered the attack or "placed a friendly request" for Jane Doe to be inconspicuously attacked under the guise of some medical services; as well as likely some other defendants shall be all hold fully responsible for their vicious, despicable, and criminal hate crimes against Jane Doe.

In addition to chemically burning Plaintiff, she has been also intentionally infected with something that still remains undiagnosed. It has been described in this complaint how it already impacted Jane Doe but it is unclear what would be the long-term damage, impact, or the development of that transmitted onto Plaintiff infection and/or virus.

**Count IV - (42 U.S.C. § 1983 – *Monell* Policy Claim against City of Baton Rouge)**

220. The actions of the city-parish-state defendants and their co-conspirators were done pursuant to one or more interrelated de facto policies, practices and/or customs of defendant the City of Baton Rouge, East Baton Rouge Parish through its police department and its DA office:

1. failing to properly investigate, charge and prosecute, and otherwise engaging in acts of crime cover-up, concealment, manufacturing, fabricating, suppression, and alteration of evidence in order to protect those it favors from criminal prosecution and civil liability;

2. filing false reports, and giving false statements and testimony and otherwise covering up the true facts;

3. perpetuating, encouraging, and condoning the unlawful police code of silence, police misconduct, fabrication, suppression, and destruction of evidence;

4. refusing to properly investigate, arrest, and charge individuals whom the police favor, specifically Plaintiff's batterer Poulicek as a favor to LADOJ from which BRPD receives millions of dollars annually;

5. physically attacking and disfiguring Jane Doe, in conspiracy with other defendants, committing hate crimes and cybercrimes against Plaintiff, eavesdropping, stealing personal electronic/digital property, and doing whatever it takes – per BRPD's secret policy – to avoid liability, avoid appearance of committing crimes under the color of law, and otherwise doing everything to avoid being linked directly to the crimes, described in this complaint.

The interrelated policies, practices, and customs, both individually and together, were maintained and implemented with deliberate indifference, encouraged hate crimes, barbaric unlawful surveillance, stealing of Plaintiff's personal digital and intellectual property, the construction and fabrication of statements, suppression, alteration, and destruction of evidence, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the state and federal courts, the maintaining of secret files, the holding of secret conversations while plotting and conspiring that, if made public would shake the world, and the destruction of files, and were, separately and together, a direct and proximate cause of, and moving force behind, the criminal and unconstitutional acts committed by the city-parish-state defendants that caused injuries, suffered by Plaintiff.

### Count V - (State Law – Intentional Infliction of Severe Emotional Distress)

221. The unlawful actions and hate crimes, committed against Jane Doe that detailed in this complaint have been done with intention to crash Plaintiff emotionally, inflict the blow so devastating from which she would never recover, intimidate her so that she will change her mind regarding wanting to publish the details of the events, described in this complaint, give her another, bigger injury to care about so that she will be consumed by another grief and will stop pursuing her rights of the crime victim of which defendants have been depriving her along with many other civil rights and liberties such as access to courts. It has been also done in a criminal conspiracy in the way disguised as "medical treatment."

As Plaintiff's dog who means the world to Plaintiff and who, because of his remarkable sensitivity and empathy, serves as a therapy dog and a service dog to Jane Doe and assists with

overcoming and living through the events, described in this complaint, hurting him was also a direct act of intentional infliction of severe emotional distress, calculated, together with other described events, to crash and destroy Jane Doe.

### Count VI - (State Law – Conspiracy to Inflict Severe Emotional Distress)

222. The acts, calculated and done in order to inflict severe emotional distress have been done in conspiracy between all defendants and their named and unnamed co-conspirators.

### Count VII - (State Law – Fraud)

223. Fraud is defined as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction," La. Civ. Code 1953. The events, described in the instant complaint are replete with fraud. Absolutely all defendants and all named and unnamed co-conspirators are guilty of fraud. In some instances, such as in the case of Weber, Small, Murphy, Dotson, Chugg, Landry, Fields, Poulicek, Booth, Nelson, Craig, Woodruff-White, Morvant, IRIS Domestic Violence Center, and many others fraud rises to the criminal levels and is tightly intertwined with the hate crimes, harsh barbaric censorship, and active crime cover-up. In other instances, such as in the case of The Advocate whose fraud resulted from silence and inaction, it is still fraud even though might be not amplified by other reprehensible actions.

### Count VIII - (State Law – Respondeat Superior)

224. At all times material to this complaint, all BRPD defendants, all DA office defendants, defendant IRIS and its staff, and some of the 19th JD defendants or unsued co-conspirators were employees of the City of Baton Rouge, East Baton Rouge Parish and were acting within the scope of their employment, and their acts that violated state law are directly chargeable to the City

of Baton Rouge, East Baton Rouge Parish under state law pursuant to respondeat superior. All other defendants such as all LADOJ defendants, some of the 19th JD defendants and many unsued co-conspirators were employees of the State of Louisiana and were acting within the scope of their employment, and their acts that violated state law are directly chargeable to The City of Baton Rouge, East Baton Rouge Parish and/or State of Louisiana under state law pursuant to respondeat superior.

## Count IX - (State Law – Defamation)

225. To fulfill their criminal agendas, defendants have been presenting Plaintiff in bad light and doing anything that it takes to secure unjust advantage to themselves at no matter what expense or injury to Plaintiff. Defendants have been presenting Jane Doe as some kind of criminal "under surveillance" to Costco, amazon, and likely many more. Woodruff-White has been publicly defaming Plaintiff and fraudulently presenting her, the victim of violent crime, as "accused" – that is the only thing that the public will see for decades to come, no one will tell them or let them see what actually happened and how wronged Jane Doe has been by that miserable Woodruff-White's court. The hearing, over which Woodruff-White presided is another example of persecution and defamation. The fraudulent medical record, created by Sharp has been specifically manufactured to attack Plaintiff's credibility and defame her. All other fraudulent "medical records" such as the ones created by Booth, Nelson, Williamson, Small, and Holloway have been aimed at discrediting and defaming while fraudulently securing unjust advantage for themselves. The entire fabricated Weber's report is the manifestation of defamation of Jane Doe. The acts of defamation and discrediting of Plaintiff are ubiquitous and countless in all those events, detailed in the complaint.

## Count X - (State Law – The Public Record Act Violations)

226. As part of a conspiracy, described in this complaint, Jane Doe was unlawfully kept from seeing the public record that pertain to the crime of violence that has been committed against her and that was purportedly investigated by BRPD. Access to the records not only had been unlawfully denied to Jane Doe in violation of The Louisiana Public Records Act, La. R.S. 44:1-41, and Article XII, Section 3 of the Louisiana Constitution but defendants utilized inconceivable unlawful and even criminal dealings in order to keep Jane Doe from seeing their phony, full of misleading, fabricated statements and omissions public record. The Plaintiff's ordeal that involved Chugg and its outrageous, criminal acts in assisting law enforcement defendants in preventing Jane Doe from seeing public record is described in this complaint in detail.

La. R.S. 44:37, Penalties for violation by custodians of records, provides:

Any person having custody or control of a public record, who violates any of the provisions of this Chapter, or any person not having such custody or control who by any conspiracy, understanding or cooperation with any other person hinders or attempts to hinder the inspection of any public records declared by this Chapter to be subject to inspection, shall upon first conviction be fined not less than one hundred dollars, and not more than one thousand dollars, or shall be imprisoned for not less than one month, nor more than six months. Upon any subsequent conviction he shall be fined not less than two hundred fifty dollars, and not more than two thousand dollars, or imprisoned for not less than two months, nor more than six months, or both.

La. R.S. 14:132 further provides that it is a criminal offense to falsify, alter, or conceal any record or document:

Injuring public records:

A. First degree injuring public records is the intentional removal, mutilation, destruction, alteration, falsification, or concealment of any record, document, or other thing, filed or deposited, by authority of law, in any public office or with any public officer.

B. Second degree injuring public records is the intentional removal, mutilation, destruction, alteration, falsification, or concealment of any record, document, or other thing, defined as a public record pursuant

to R.S. 44:1 et seq. and required to be preserved in any public office or by any person or public officer pursuant to R.S. 44:36.

C. (1) Whoever commits the crime of first degree injuring public records shall be imprisoned for not more than five years with or without hard labor or shall be fined not more than five thousand dollars or both.

(2) Whoever commits the crime of second degree injuring public records shall be imprisoned for not more than one year with or without hard labor or shall be fined not more than one thousand dollars or both.

Defendants kept obdurately and unrepentantly withholding public records knowing that it is a serious criminal offense – as this complaint details, the frauds in charge of "law" and "justice" do not seem to apply any law to themselves and have no difficulties of breaking it.

La. R.S. 14:133 makes it a crime to file a false public record:

Filing or maintaining false public records:

A. Filing false public records is the filing or depositing for record in any public office or with any public official, or the maintaining as required by law, regulation, or rule, with knowledge of its falsity, of any of the following:

(1) Any forged document.

(2) Any wrongfully altered document.

(3) Any document containing a false statement or false representation of a material fact.

With complete understanding that submitting false statements, altering, manufacturing, or misrepresenting material fact is a crime, Weber created a report full of false, fabricated, and misleading statements, with authorization, approval and criminal assistance of other defendants. False, misleading, and altered public records have been also created and maintained by Woodruff-White and Morvant.

Injuring public records and filing and maintaining false public records is also a "racketeering activity" which is "committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime," as defined by La. R.S. 15:1352.

WHEREFORE, Plaintiff demands judgment against all defendants for all counts/causes of action for compensatory, general, and punitive damages as well as for attorney's fees, expert fees, and all costs, incurred by this litigation.

## JURY DEMAND

Plaintiff demands trial by jury on all triable issues.

Respectfully submitted

BY:

Lydia McCoy

3055 NW Yeon Ave #6315

Portland, OR 97210

qaidyl@pm.me

Tel.: 225-678-2464